Monica BING, Plaintiff,

v.

Ann HALSTEAD, Defendant.

77 Civ. 3143 (VLB).

United States District Court,
S. D. New York.

July 2, 1980.

Levy & Levy, P. C., New York City, for plaintiff.

Danziger, Bangser, Klipstein, Goldsmith & Greenwald, New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

This is an action for the negligent or intentional infliction of mental distress. Plaintiff requests special damages, an award for pain and suffering and exemplary damages. This action was commenced in the Supreme Court of New York County by personal service of summons and complaint upon defendant, a resident of Arizona, while she was passing through New York.

Defendant removed this action to this court pursuant to 28 U.S.C. § 1441 and now moves for summary judgment on the ground that Costa Rican law controls, and that it does not recognize as a tort the conduct alleged in the complaint.

## II.

For the reasons stated below, the motion for summary judgment is granted, and the complaint is dismissed.

## III.

For the purposes of this motion, the following facts are not in dispute.

This action arises from the troubled relationships of the Bing family. Plaintiff is the daughter of Maja Bing, deceased, and John Bing. She has two brothers, Andrew and George. Defendant is plaintiff's aunt and the sister of John Bing.

Since infancy, plaintiff has suffered from a celiac disease and atopic dermatitis, ills which have required medical attention. When plaintiff was fifteen, her parents were divorced and plaintiff went to live with her father. Plaintiff felt that her mother and brothers were aligned against her and that defendant harbored ill will towards her and favored her brothers.

In October of 1974, when plaintiff was eighteen, she wrote her mother a letter which announced that communications between them from that moment would cease. In order further to insulate herself from family pressure, particularly that of her aunt and her brother George, plaintiff moved to Costa Rica in May of 1975. In Costa Rica, plaintiff enrolled in the university and resided at the home of her family's psychiatrist, who had moved there from New York for his health. She informed no one of her whereabouts except Mildred Netzke, her father's former housekeeper, who forwarded letters to her from New York.

Plaintiff's mother died in January, 1976. The terms of her will had the effect of making plaintiff the sole beneficiary. Plaintiff was notified of her mother's death, but did not return to the United States at that time.

Plaintiff's father continued to support her financially by sending checks to Mildred Netzke, who forwarded them to plaintiff. Her father made no effort to locate plaintiff, nor did he know of her whereabouts until March, 1977.

Defendant, who had moved from New York to Arizona in 1974, wrote a letter dated March 18, 1977 to plaintiff to urge her to share her mother's estate with plaintiff's brothers.[1] It is this letter which

1. The text of the letter follows:

My dear Monica

I am sure you know that we not only talk about you, and more often yet, think of you. Paul and I at all times feel very confident that you are quite well, but I do not want to deny that we are concerned.
Your brothers and surely Dad miss you much more, and many good and many sad things have occurred since the last time all the 5 of you were together.
I am particularly thinking now of the time when Mam suddenly died, and Andy and George's great concern to do for Mam all the right things. It was a very painful task indeed, and I tried to help them a bit, but this was merely a fraction in time and in fact. My letter today to you is prompted by the fact that Dad phoned me last night to read to me the letter which Chester Inwald wrote to all of you about a week ago. It is a very clear letter, which however I feel warrants an answer from YOU. You might ask "WHY" and I thought I tell you why I think so. We have known something very important about Mam, namely that she tried to spread her love and her concern evenly amongst the three of you. This is surely never easy, and I am not saying that she always succeeded. It is apparent that her will was written a few years ago, when possibly her assets were more than they were at the time of her death. However, I feel that at no time were her assets such that the will should have been written as it was. And here I very strongly question Chester Inwald what led him to follow her instructions. A trust is a very good thing, provided there are assets, such as real estate, life insurance, and other equity. Mam had an inheritance from her father, the amount was known to Mr. Inwald, and she lived predominantly from the alimony Dad paid her.
Her will clearly states that everything should go into three parts. However the EDUCA-

caused plaintiff's emotional distress. The letter was mailed from Arizona to Chester Inwald, the executor of plaintiff's mother's estate, in New York. Mr. Inwald then sent the unopened letter to Mildred Netzke, who forwarded it to plaintiff in Costa Rica. After reading the letter, plaintiff suffered ills which confined her temporarily to bed and required medical attention.

Since moving to Costa Rica, plaintiff has been back in the United States six times, although never for more than a week consecutively. On these occasions she saw her father and friends and on most or all of them engaged in activity connected with this litigation. For the purposes of this motion, defendant has conceded that plaintiff did not form a fixed intention to abandon New York forever as her domicile.

### IV.

■ In diversity cases brought under 28 U.S.C. § 1332(a), federal courts are bound to follow the choice of law rules of the forum state in determining the substantive governing law. *Klaxon Co. v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See also Day and Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975); *Loebig v. Larucci*, 572 F.2d 81, 84 (2d Cir. 1978); *Rosenthal v. Warren*, 475 F.2d 438, 440 (2d Cir. 1973).

Prior to 1963, New York had generally resolved choice of law questions arising in tort cases by inflexible reference to the law of the place where the tort occurred. In *Babcock v. Jackson*, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963), however, the Court of Appeals substituted a test which looks to the contacts of the parties with each state involved and the interests of each state in applying its substantive law to the resolution of the controversy. The Court of Appeals later described the change affected by *Babcock*:

> When in *Babcock v. Jackson* . . . we rejected the mechanical place of injury rule in personal injury cases because it failed to take account of underlying policy considerations, we were willing to sacrifice the certainty provided by the old rule for the more just, fair and practical result that may best be achieved by giving controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in litigation.

*Neumeier v. Kuehner*, 31 N.Y.2d 121, 123, 286 N.E.2d 454, 457, 335 N.Y.S.2d 64, 69 (1972) (Fuld, C. J.).

In *Babcock* the issue was the applicability of the automobile guest statute of foreign jurisdiction which barred recovery by plaintiffs/passengers against defendants/hosts. New York does not so limit a driver's liability. The *Babcock* doctrine was further developed and elaborated in a series of guest statute cases. *See Dym v. Gordon*, 16 N.Y.2d 120, 209 N.E.2d 792, 262 N.Y.S.2d 463 (1965); *Miller v. Miller*, 22 N.Y.2d 12,

---

TIONAL TRUST FUND to which you are entitled to is strange. George and Andy got their college years paid for by Dad, and there has never been any doubt that Dad would not do the same for you. While your parents will prior to the divorce provided for this fund in exactly these amounts and ages, it is strange that Mam felt compelled to provide education for her children.

Chester Inwald questions the advisability to set up a Trust—because it is costly—my question is a different one and quite simple: Was it Mams intent to leave all her remaining money to YOU, or would she have preferred to see it divided amongst the three of you?

This then is my question, and please give me or Chester Inwald your answer.

Now to a couple of other things—Paul and I are very beautifully installed in our new home and look into a lot of sunshine. Dottie will come with Naomi and Becca to visit (while Ron picks up his new computer as Head of Pathology for Denver General). Can you imagine that its just been 10 years that you have been Jr. Bridesmaid for them? Teddy—and especially Libby have become ardent horseback riders and skiers and last summer they were both with us in Colorado on a ranch near Estes Park—and now Libby is part-owner of a horse in Brussels.

But the great "little one" is Mary Beth, she sparks with personality and vigor.

Listen, Monica when I say we miss you—I mean it—we miss you VERY MUCH, and so hope that soon past times can truly become past, and that once more the Bings who will all be grown-up individuals can share their good times, the hard times and in-between times.

237 N.E.2d 877, 290 N.Y.S.2d 734 (1968); *Tooker v. Lopez*, 24 N.Y.2d 569, 249 N.E.2d 394, 301 N.Y.S.2d 519 (1969); *Neumeier, supra.*

When the interest analysis does not point clearly to the law of any jurisdiction, the law of the place where the tort occurred prevails. *Neumeier v. Kuehner, supra*, at 128–129, 286 N.E.2d at 457–458, 335 N.Y. S.2d at 69–70; *Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 699, 376 N.E.2d 914, 915, 405 N.Y.S.2d 441, 442 (1978). ("It is true that *lex loci delicti* remains the general rule in tort cases to be displaced only in extraordinary circumstances.")

Factors to be considered in the New York interest analysis are the domiciles of the parties, the place where the tortious conduct occurred and where the injury was suffered, and the policies behind the substantive laws of the respective jurisdictions. The factors relevant to such an analysis are here dispersed over three jurisdictions. The defendant's conduct occurred in her domicile, Arizona. Plaintiff was injured in Costa Rica, where she resided for several years. Plaintiff is domiciled in New York.

None of these jurisdictions has a compelling interest in applying its own law. Costa Rica may have an interest in determining rights and liabilities associated with injuries within its borders, but not when neither of the parties is a domiciliary there and when the conduct which its laws permit occurred elsewhere.[2] New York has an interest in applying its laws to its domiciliaries, but not when neither conduct nor injury occurred within its borders and when the party seeking protection of its laws is a long-time resident of another jurisdiction. Arizona has no interest in applying its law in favor of a New York plaintiff injured in Costa Rica.[3] Since the interest analysis does not point clearly to the law of any jurisdiction, the law of the place where the tort occurred prevails.

Further, the interest analysis developed in the guest statute cases was intended to apply to conflicts settings involving defenses to and limitations on liability. Where the issue is the standard of conduct, as it is here, rather than the extent of liability, "it is appropriate to look to the place of the tort so as to give effect to that jurisdiction's interest in regulating conduct within its borders, and it would be unthinkable to seek the applicable rule in the law of some other place." *Babcock*, 12 N.Y.2d at 483, 191 N.E.2d at 284, 240 N.Y.S.2d at 751; *Heaney v. Purdy*, 29 N.Y.2d 157, 159, 324 N.Y.S.2d 47, 48, 272 N.E.2d 550, 551. Where tortious conduct occurs in one jurisdiction and injury in another, as is the case here, the law of the place of injury applies. *Church of Scientology of California, Inc. v. Green*, 354 F.Supp. 800 (S.D.N.Y.1973) (libel action).

Since the alleged injury occurred in Costa Rica, the substantive law of that country controls. Both parties have submitted, pursuant to Fed.R.Civ.P. 44.1, affidavits of Costa Rican attorneys concerning the application of Costa Rican law to the facts of this case. On the basis of those affidavits I find that Costa Rica does not recognize a justiciable claim in tort for the negligent or intentional infliction of mental distress resulting from a letter such as the one written by defendant. Both Costa Rican attorneys agree that the majority of Costa Rican courts have held that only if the communication itself constituted a criminal utterance is an action for damages permitted. While plaintiff's Costa Rican attorney cites criticism of this rule in dissenting opinions and elsewhere, my function here is not to determine what Costa Rican law should be but rather what it is.

The affidavit of plaintiff's Costa Rican counsel alleges that defendant's conduct violates Article 377 of the Criminal Code, which prohibits "[divulging] facts related to the private life of one person or a family, which, without being calumnious, slander-

---

2. *See* p. 520, *infra* for a discussion of Costa Rican law.

3. Arizona has recognized a cause of action for infliction of mental distress. *See Savage v. Boies*, 77 Ariz. 355, 272 P.2d 349 (1954).

ous or injurious could cause mischief, inconvenience or mortification to said person or family." Defendant's conduct does not come within the scope of that statute, since defendant's letter to plaintiff was not "divulged" by defendant to outsiders. Absent a cognizable claim under the Criminal Code, no cause of action will lie under Costa Rican law.

Since Costa Rica does not recognize as a tort the infliction of mental distress, as alleged in the complaint, no cognizable claim has been stated.

SO ORDERED.