EL CID, LTD., Plaintiff,

v.

The NEW JERSEY ZINC COMPANY, Gulf & Western Industries, Inc., Gulf & Western International Holding Company, Gulf & Western (Canada) Limited, Watts, Griffis & McOuat, Limited, Camino Gold Mines Limited, Condor Mining, Inc., Richard W. Hogeland and David M. Koogler, Defendants.

No. 76 Civ. 1388 (WK).

United States District Court,
S.D. New York.

Dec. 15, 1983.

Malcolm H. Bell, Norwalk, Conn., for plaintiff.

Kassel, Hoffman, Neuwirth & Geiger by Joseph Einstein, Kimmelman, Sexter & Sobel by Arthur Sobel, Satterlee & Stephens by Henry J. Formon, Jr., Aranow, Brodsky, Bohlinger, Benetar & Einhorn by Susan Belkins, New York City, for defendants.

## MEMORANDUM & ORDER

KNAPP, District Judge.

Plaintiff El Cid, Ltd. ("El Cid") has claimed in its amended complaint that the various defendants, acting in concert,[1] engaged in illegal activities in connection with the purchase of the rights to mine the Bolgol mining concessions ("the Bolgol") in Bolivia's gold-rich Tipuani Valley. Plaintiff alleged, first, that defendants' actions violated the Sherman and Wilson Tariff Acts (15 U.S.C. § 1, 15 U.S.C. § 8); second, that defendants interfered with its contractual, precontractual, and business relationships with respect to its own attempts to purchase the right to, and mine, the Bolgol; and third, that defendants engaged in a common-law conspiracy to deprive it of these rights.

In our prior decision, published at 551 F.Supp. 626, we granted summary judgment to defendants on plaintiff's first cause of action. This decision, however, was provisional, and dismissal of the antitrust claim was stayed pending defendants' motions to dismiss the remaining claims.[2] These motions are now before us.[3]

## BACKGROUND

Some of the facts relevant to this motion are set forth in our prior published opinion. Familiarity with them is presumed, and we shall not repeat them here. However, for the instant motion we set forth, in addition, the following facts and contentions.

In March of 1974 plaintiff's predecessors contracted with one Helmut Gaensel and Gaensel Gold Mines & Co., Ltd. ("Gaensel"), a claimant to the Bolgol, to purchase Gaensel's rights if and when his claim to them, then contested in litigation in Bolivia by one of the defendants, should be vindicated. This contract was entered into in Florida. In May 1975 Gaensel's claim was vindicated in the Bolivian courts. In June 1975 Gaensel and plaintiff entered into a second, superseding agreement for the sale of the rights to the Bolgol. Neither this superseding agreement nor the first contract was subjected to the notarization and registration required by Article 171 of the Bolivian Mining Code to make it an *escritura pública*, or a public writing, legally enforceable under Bolivian law. In July 1975 Gaensel contracted to sell these same rights to defendants, which sale was conditioned on plaintiff's failure to satisfy certain of its payment obligations under the June 1975 agreement. Plaintiff did so fail, and the transaction between defendants and Gaensel was completed and the contract between them duly made an *escritura pública*.

Plaintiff asserts that, in their efforts to gain the Bolgol concession, defendants met and conspired in New York to take any means possible to deprive plaintiff of its

1. The defendants assert that each of them played a different role in the transactions which form the background for this action. However, since we assume for the purposes of this motion the truth of plaintiff's allegations that all defendants acted in concert, we will refer to them collectively and not distinguish which defendant performed which actions, except where necessary for the sake of clarity. We will similarly not distinguish among their arguments in opposition to plaintiff's allegations, although we realize that should we reach the merits of this action, certain of the defendants would rely upon their alleged nonparticipation in certain events rather than upon the purported legality of those events, which is the only issue we here find it necessary to discuss.

2. Although the remaining claims are before us only on principles of pendent jurisdiction, the long pendency of this action persuaded and persuades us that it would be inequitable to dismiss them solely because we have found plaintiff's one federal cause of action to be without merit.

3. This constitutes our second opinion on these motions, and should be considered as amending and superseding our first (unpublished) opinion, dated July 8, 1983.

contract with Gaensel. In furtherance of this plan, according to plaintiff, the defendants attempted to exert improper influence over the Bolivian judge before whom the Gaensel litigation was pending; met with Gaensel while his contract with plaintiff was still pending; drove away plaintiff's intended source of financing for its projected mining ventures; engaged in baseless and harassing litigation in Bolivia; sought legislation in Bolivia, in the form of a Supreme Decree, to the effect that title to the Bolgol was theirs; and suborned Bolivian attorneys, who gave plaintiff faulty legal advice, thereby causing it to refrain from raising its contract with Gaensel to a judicially enforceable *escritura pública.*

Defendants admit that they pursued litigation and legislation in Bolivia. However, they deny the existence of any conspiracy to deprive plaintiff of its rights; and further deny that any illegal action whatsoever was taken at any stage of the proceedings.

In the instant motion, defendants contend that the law applicable to plaintiff's tort claims is that of Bolivia, which, they assert, does not recognize the torts alleged by plaintiff and further does not provide for criminal or civil sanctions for any of the actions which plaintiff attributes to them. We find that defendants are correct in their first assumption, and hold that plaintiff's allegations must be governed by the substantive law of Bolivia. Both plaintiff and defendants have relied upon the testimony of experts in the law of that country: plaintiff upon Dr. Fernando Rojas Hernandez, a Bolivian attorney; defendants on Professor Henry DeVries of Columbia University. By the law of this case, as set forth in our unpublished Memorandum and Order of July 8, 1983, we have limited our consideration of that law to those statutes relied upon by Dr. Rojas in his affidavits on this motion.[4] We conclude that the facts alleged by plaintiff—drawing all inferences in its favor—would be sufficient to estab-

lish a valid cause of action under one such statute. We accordingly deny defendants' motion for summary judgment and set the case down for trial solely to determine the disputed material issues of fact raised by defendants' denials of plaintiff's allegations as to this single statute.

Choice of Law

In choice-of-law questions where federal jurisdiction is based on diversity or pendent jurisdiction, a federal court must be guided by the rules of the jurisdiction in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.* (1941) 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; *Hall v. E.I. DuPont deNemours & Co.* (E.D.N.Y.1972) 345 F.Supp. 353; *Maltais v. United States* (N.D.N.Y.1977) 439 F.Supp. 540. The New York courts—whose law thus governs—apply to tort actions the law of the jurisdiction with the "most significant relationship" with the subject matter of the alleged tort. *Nader v. General Motors Corp.* (1970) 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765; *Church of Scientology of California, Inc. v. Green* (S.D.N.Y.1973) 354 F.Supp. 800. We turn, therefore, to the relationships to the alleged torts of the various jurisdictions which figure in this action.

We note at the outset that although the continent-and globe-spanning domiciles and activities of the parties in the action before us have touched many jurisdictions, only three—Bolivia, New York and Costa Rica— are asserted to have any significant connection to the events before us for choice of law purposes. According to plaintiff's allegations, their relationship to the alleged activities of the various defendants may be grouped as follows:

*New York*
conspiracy meetings held; birthplace and seat of control of the conspiracy
negotiations between defendants and Gaensel

---

**4.** In that decision, we scheduled a hearing at which plaintiff's expert might testify, if he so chose, on his interpretation of Bolivian law, with the proviso that any such testimony would be "confined to [his] explanation of the asser-

tions contained in his affidavits now on file ... No new material will be considered." Memorandum and Order at 22. This hearing was held on September 12, 1983.

citizenship of two defendants (Gulf & Western and Condor Mining, Inc.)

source of financing for defendants' intended mining activities

*Bolivia*

conspiracy meetings held

improper and harassing litigation entered into

undue influence on judge attempted

legislation sought

lawyers suborned

real property situated

transfer of real property occurred

*Costa Rica*

location of plaintiff when it suffered injury

contract of June 25, 1975 signed by plaintiff and Gaensel

Defendants contend, and we agree, that the above allegations demonstrate that Bolivia has numerous and significant contacts with the torts alleged. According to these allegations, practically all the "overt acts" performed by defendants in furtherance of their illicit goals occurred in that country. Not all of these activities, according to plaintiff, were successful—the alleged attempted use of undue influence on Bolivian judges, for example, did not prevent Gaensel from gaining title to the Bolgol in the original suit. We find that they were, nonetheless, important to defendants' efforts to gain control of the Bolgol; and, in addition, that the very existence and quantity of these activities indicate the strength of the link between Bolivia and the defendants' alleged tortious conduct.

It has been held with respect to common-law conspiracy that "[t]he liability is in tort, but the conspiracy is not a tort. The injury flowing from the conspiracy is the tort." *Albert Levine Associates v. Bertoni & Cotti* (S.D.N.Y.1970) 314 F.Supp. 169, 171. We find that plaintiff's alleged injury may well have been materially caused by the various activities which it alleges defendants pursued in Bolivia. For example, plaintiff asserts that it failed to raise its contract with Gaensel to a judicially enforceable *escritura pública* on the recommendation of Bolivian counsel who were paid by defendants. Similarly, the Bolivian litigative and legislative actions taken or sought by defendants, whether successful or not, are alleged to have given defendants the time required to proceed with their machinations and to gain the Bolgol for themselves.

We reject plaintiff's contention that these actions, "though reprehensible in execution, were not primary to the conspiracy's success." Plaintiff's Answering Affirmation at 3. We further reject its suggestion that this success was achieved through defendants' negotiating with Gaensel in New York, conferring and contracting with him in Miami, and driving off the principal source of plaintiff's anticipated funding "as initiated ... from the Pennsylvania offices of G & W, Inc." *Id.* While some of these actions may indeed have had an effect on defendants' success in obtaining the Bolgol, we are unconvinced that they were the "main steps by which the conspiracy succeeded." *Id.* The injury claimed by plaintiff—the deprivation of the right to mine the Bolgol—occurred principally as a result of defendants' obtaining this right in its place. The driving off of the primary source of plaintiff's funds, while perhaps detrimental to plaintiff's chances of acquiring the mining concessions, does not strike us as being of the same decisive or damaging nature. Defendants' negotiations with Gaensel in New York, since they did directly affect defendants' ability to acquire the Bolgol, pose a more serious issue. However, as discussed below, we do not find that this single activity is more crucial to defendants' success than the various actions which occurred in Bolivia. Finally, while the signing of the contract between Gaensel and defendants in Miami was certainly important to defendants' success—and plaintiff's failure—in obtaining the Bolgol, we note that this was the only event to occur in that jurisdiction; and that plaintiff apparently has not considered it significant enough to warrant a contention that the substantive laws of Florida should control.

In sum, we find plaintiff's assertion that the actions taken in Bolivia were comparatively unimportant to be wholly against the

weight of the evidence before us. Insofar as we understand plaintiff to suggest that any activities which occurred in Bolivia are, as a matter of course, entitled to lesser consideration because no party to this action is a domiciliary or citizen of that country, we can say only that we have been referred to no authority for this contention, and find it untenable.

■ Further supporting defendants' assertion that Bolivian law is controlling is the fact that the subject of this action—the golden egg itself—is real property located in Bolivia. It is well settled that where rights to real property are in issue, the law of the situs of the property control. *Carrolton Associates v. Abrams* (Sup.Ct.N.Y. Cty.1968), 57 Misc.2d 617, 293 N.Y.S.2d 159. Although this action sounds in tort, and neither party seeks to have the rights to the Bolgol determined here, we think that this well-established choice of law rule is, while not determinative (as defendants imply) at least important to our consideration. Of similar significance is the undisputed fact that the mining of gold in Bolivia, and all rights and activities connected with it, are strictly regulated by the Bolivian government.

■ We reject plaintiff's contention that New York's connections to this action outweigh those of Bolivia.[5] Plaintiff relies heavily on the allegation that defendants' New York activities spawned the alleged conspiracy. This, however, establishes no more than a significant relationship with a plot which in and of itself is non-actionable. *Albert Levine Associates, supra.* Despite plaintiff's allegations that "G & W, Inc. controlled, financed and directed [the conspiracy] from New York," Plaintiff's Memorandum of Law in Opposition at 1, the fact remains that plaintiff has failed to demonstrate a close connection between

New York and "the injury flowing from the conspiracy," *Albert Levine Associates, supra,* 314 F.Supp. at 171. Plaintiff has provided no evidence that meetings held in New York were crucial while those held in Bolivia were not; nor any evidence as to how the alleged control from New York was exerted, or what actions were taken in exerting it. In fact, the sole concrete activity which plaintiff sets in New York is the series of negotiations between defendants and Gaensel during which the defendants allegedly laid the groundwork for seducing Gaensel into abandoning his commitment to plaintiff—a process consummated not in New York but in Miami. These meetings, while important to defendants' success in gaining the Bolgol, constitute but one action and do not convince us that New York bears the necessary connection to the events alleged.

Similarly, with respect to plaintiff's allegations of interference with business, contractual and precontractual relations, we reject plaintiff's contention that the tortious conduct centered around New York. This position flies in the face of reason in light of the fact that New York was the locale of so few of the activities which allegedly so interfered, or led to such interference. We do not by this finding minimize the importance of plaintiff's allegations that the defendants lured Gaensel into breaking his contract with plaintiff and entering improperly into a contract with them. However, the fact that this allegedly occurred in New York simply does not establish that New York, above all other jurisdictions, was the primary location of defendants' activities or the torts or injuries to which they allegedly led.

Nor does the New York citizenship of two defendants add significantly to that

**5.** Plaintiff urges the novel proposition that, as between New York and Bolivian law (as the latter is interpreted by defendants) there can be no conflict. Plaintiff, pointing to defendants' contention that there exists no Bolivian law forbidding any of their alleged conduct, argues that while a law may conflict with another law, it cannot conflict with the absence of a law. Plaintiff cites in support of this attractively simple suggestion several wholly inapposite cases

which in actuality hold that no conflict exists where the law of one jurisdiction reflects a governmental policy or interest, while the law of another reflects none. It is thus accurate, under these cases, to say that the absence of a *policy* cannot conflict with a *policy.* However, plaintiff does not argue that Bolivia's purported lack of regulation demonstrates the absence of a policy, and we do not address that issue.

jurisdiction's side of the choice of law scale. Plaintiff attempts to bolster its position by making much of the roles of these two defendants in the alleged conspiracy. According to plaintiff, defendant Gulf & Western masterminded and controlled the entire conspiracy from its seat in New York,[6] while defendant Condor Mining, Inc. was active in the conspiracy and, as the company which actually contracted with Gaensel for the Bolgol, brought defendants' schemes to fruition. However, the New York citizenship of these entities, in and of itself, does not create a sufficiently significant contact for choice-of-law purposes. Certainly New York may express an interest, cognizable for choice of law inquiries, in regulating the conduct of its citizens. However, plaintiff has failed to adduce any authority for the proposition that in a situation such as that before us "New York has an interest in policing the conduct of its residents within the state to see that they don't harm people outside the state who are not New Yorkers." Tr. of February 18 at 34.

Plaintiff relies principally on *Intercontinental Planning, Ltd. v. Daystrom, Inc.* (1969) 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576. This reliance is misplaced. In *Daystrom* the New York Court of Appeals found that New York had a public policy of protecting its "position as an international clearing house and market place" which gave it an interest in policing contracts entered into by New York brokers and their agents whose services were rendered in New York. This provides no support for plaintiff's far-reaching contention that New York has a paramount interest in applying its law whenever a business entity there situated commits a tort anywhere against anyone.

Plaintiff is similarly unaided by its quasi-interest analysis contention that if, as defendants assert, Bolivian law does not prohibit the actions allegedly taken by them, this is an "unfair or anachronistic" policy which should not be tolerated by a New York court. Whatever the state of Bolivia's law, it does not establish a "foreign immunity" like that rejected in *Haehl v. Village of Port Chester* (S.D.N.Y.1978) 463 F.Supp. 845, 849, on which plaintiff relies. Further, plaintiff has not demonstrated to us that such a state of the law is in fact "anachronistic" or, indeed, that it is "unfair" to any group whose membership includes anyone other than plaintiff itself.

The remaining cases on which plaintiff relies are similarly unavailing. Some (like *Daystrom* and *Haehl*) concern specific situations or categories of actions—into which this action does not fit—in which New York has articulated an express public policy; while the others exhibit a "significant relationship" between New York and the subject of the action quite apart from the parties' citizenship.[7] We are, however, aware of no case in which New York has expressed the sort of interest hypothesized

**6.** Plaintiff's Statement Pursuant to Rule 3(g) at 2–3. Gulf & Western, contrary to this assertion, claims that the Bolgol affair "was a small investment, handled independently by [defendant New Jersey Zinc] through its executives in Bethlehem, Pennsylvania, and one with which G & W in New York had no real contract." Affidavit of David N. Judelson at 3. Watts, Griffith & McOuat, the entity which actually acquired title to the Bolgol, has responded to plaintiff's allegations by pointing out that it is a Canadian corporation with its principal (and only) place of business in Toronto, Ontario.

**7.** *Rudin v. Dow Jones & Co.* (S.D.N.Y.1981) 510 F.Supp. 210 (defendant's activities upon which the action focused were centered in New York); *Kristinus v. H. Stern. Com. E. Ind., S.A.* (S.D.N.Y.1979) 463 F.Supp. 1263 (contract to be performed in New York); *Pan American World Airways, Inc. v. Boeing Company* (S.D.N.Y.1980) 500 F.Supp. 656 (*plaintiff* incorporated and headquartered in New York; relevant conduct occurred in New York); *O'Keeffe v. Bry* (S.D.N.Y.1978) 456 F.Supp. 822 ("a substantial part, if not all" of New York defendant agent's conduct occurred in New York); *Thorn v. New York City Department of Social Services* (S.D.N.Y.1981) 523 F.Supp. 1193 (plaintiff seized in Pennsylvania, held in New York for six months); *Chila v. Owens* (S.D.N.Y.1972) 348 F.Supp. 1207 (host-guest liability); *Johnson v. Hertz Corp.* (S.D.N.Y. 1970) 315 F.Supp. 302 (New York statutes "express a policy aimed at protecting innocent victims of New York vehicle registrants"); *Kunstsammlungen zu Weimar v. Elicofon* (E.D.N.Y. 1981) 536 F.Supp. 829, *aff'd* (2d Cir.1982) 678 F.2d 1150 (transfer of personal property governed by location of property in New York).

here by plaintiff based solely on the New York citizenship of one or more defendants, in the absence of any substantial connections between New York and the tort itself. Nor can we discern such a connection from the fact that defendants obtained from New York sources some or all of the money to finance their Bolivian activities. The fact that this financing was helpful to those activities does not necessarily mean that it is important, for choice of law purposes, in the context of the other activities above discussed; and we cannot in fact say that the location of the source of defendants' financing is nearly as important a "contact" as the various activities which plaintiff ascribes to Bolivia.

Plaintiff urges, as an alternative choice-of-law theory, that even if Bolivia has the most significant relationship to the torts alleged, the law of Costa Rica is to be preferred because the plaintiff was located there when it suffered injury. This fact of location, plaintiff argues, makes Costa Rica the *locus delicti.*[8] Plaintiff's position essentially boils down to an assertion that in a choice of law determination the jurisdiction in which the plaintiff is located at the time of injury is to be given especial weight, solely because the plaintiff was located there. The cases cited by the plaintiff for this proposition, however, do not demonstrate so narrow a focus. While these cases have indeed applied the laws of the jurisdictions in which the plaintiffs were located, those jurisdictions were, in addition, the sites of other events or circumstances crucial to the causes of action themselves. *Hargrave v. Oki Nursery, Inc.* (2d Cir.1980) 636 F.2d 897, *reh. den.,* 646 F.2d 716 (injury occurred, for jurisdictional purposes, in the state where plaintiffs were doing business, defendants made

misrepresentations about merchandise, and the merchandise was shipped); *Vanity Fair Mills, Inc. v. T. Eaton Co.* (2d Cir. 1956) 234 F.2d 633 (location of allegedly fraudulent activity; passing off of a product occurs where consumers mistakenly buy wrong product); *Albert Levine Associates v. Bertoni & Cotti, supra,* 314 F.Supp. 169 (officer of foreign defendant came to New York, conspired in New York with New York defendant to refuse to sell to plaintiff, transmitted this decision to plaintiff in New York); *Bing v. Halstead* (S.D.N.Y.1980) 495 F.Supp. 517 (plaintiff alleged emotional distress caused by letter which she received and read in country where domiciled).

The authority marshaled by plaintiff thus does not contradict the formulation upon which we continue to rely: "that in the sphere of commercial torts, the situs of the injury is 'the place where the critical events associated with the dispute took place'." *MIJE Associates v. Halliburton Services* (S.D.N.Y.1982) 552 F.Supp. 418, 419, *quoting Spectacular Promotions, Inc. v. WING* (E.D.N.Y.1967) 272 F.Supp. 734, 737.[9] In the instant case the country in which plaintiff was located had no connection to the tort or any of the actions complained of. Nothing of any import happened in Costa Rica: no meetings were held, no financing sought, no allegedly illegal acts taken. The fact that Costa Rica was the location of the signing of the June 25, 1975 contract between plaintiff and Gaensel seems to us irrelevant. The action before us is not one to enforce or take any action with respect to this contract, but rather is based on the allegedly tortious activities of persons not parties to that contract. These persons and activities, as

---

8. We note that this theory was not seriously presented prior to oral argument. Despite the appearance of a reference to Costa Rican law in one of plaintiff's many briefs, counsel for plaintiff several times assured us that this was purely illustrative and not indicative of any legal contentions. However, we reject defendants' claims of prejudice from the timing of plaintiff's current assertions, in light of the ample opportunity provided to all parties to present supplemental arguments.

9. Significantly, the court in *Bing, supra,* turned to the question of the *lex loci delicti* only after determining that, other than the *locus delicti* no other jurisdiction "has a compelling interest in applying its own law," 495 F.Supp. at 520. In the instant action, on the other hand, as we have noted, one jurisdiction—Bolivia—does indeed have such an interest.

we have said, all lacked any connection to Costa Rica or any events which there transpired. Plaintiff has presented us with no case, and we know of none, in which residence or location *alone* has been found to establish the controlling jurisdiction for choice of law purposes. We therefore reject its contention that the law of Costa Rica applies to the action before us.

Bolivian Law

■ We turn now to defendants' contention that plaintiff's allegations against them, even if true, do not state a cause of action under Bolivian law. In that connection, we note that under Federal Rule of Civil Procedure 44.1 any determination we might make as to Bolivian law would be "treated as a ruling on a question of law." Such a determination may thus be made in a motion for summary judgment, despite the existence of material disputes between the parties.

Defendants contend that the acts of which plaintiff accuses them do not set forth a cause of action under any Bolivian statute.[10] Dr. Rojas, plaintiff's expert on Bolivian law, asserts in his affidavits that an action might indeed be maintained in a Bolivian court under any of the following four such statutes:

*Civil Code*

Article 966. Any man who causes injury to another is obligated to compensate him for it.

Article 967. Everyone is liable not only for the injury caused by his act, but also for that caused by his negligence or imprudence.

*Penal Code*

Article 303. (Attacks against the freedom to work)

Whoever impedes, obstructs or restricts the freedom to work, to exercise a profession or office, commerce or industry, incurs prison of one to three years.

Article 87. (Civil Liability)

Any person liable for a penal offense is also liable civilly and is obligated to compensate for the economic and moral injury caused by the delict.[11]

Penal Code Article 87 does not, of course, provide an independent cause of action. We therefore need consider only Civil Code Articles 966–967 and Penal Code Article 303.

With respect to Articles 966 and 967, Professor DeVries, defendants' expert, testified that

these articles are, in effect, an appendage to the Penal Code. What they in effect create is vicarious liability ... or liability for what they call acts or damages caused by things, but the substantive duty must be found in the penal law [which] embraces many of the situations which we call personal injury tort.

Tr. of March 1 at 10. Subsequent to this testimony, Dr. Rojas testified that liability under a separate *penal* statute is not a prerequisite for liability under Articles 966 and 967. Tr. of September 12 at 145. Professor DeVries chose not to rebut this statement, nor did he contradict our assumption, stated on the record, that his meaning was probably rather that a viola-

---

**10.** Defendant makes much of the fact that Bolivian law does not recognize the precise torts alleged in the Complaint: namely, interference with contractual, precontractual or business relations, or common-law conspiracy. We find this to be of no moment. At the time plaintiff framed its pleading, it did not expect that the law of Bolivia would be applied to its allegations. We therefore consider sufficient the existence of any cause of action, whether or not equivalent to those named in the Complaint, provided of course that it is based upon the factual allegations included in the complaint.

**11.** These quotations are agreed to be accurate translations from the Spanish, which reads as follows:

Art. 966. Todo hombre que causa a otro algun daño esta obligado a repararlo.

Art. 967. Todos son responsables no solo del daño causado por su hecho, sino tambien del que ocasiona su negligencia o imprudencia.

Art. 303.—(*Atentados contra la libertad de trabajo*)

El que impidiere, obstaculizare o restringiere la libertad de trabajo, profesión u oficio, comercio o industria, incurrirá en reclusion de uno a tres años.

Art. 87.—(*Responsabilidad Civil*)

Toda persona responsable penal mente, lo es tambien civilmente y está obligada a la reparación de los daños materiales y morales causados por el delito.

tion of some other statute, penal or civil, had to be found before Articles 966 and 967 would be applicable. Tr. of September 12 at 148, 152, 154, 155, 156. Dr. Rojas agreed that these Articles would not come into play unless and until there had been some determination that the party against whom they were to be invoked had committed some wrongful or illegal act. Tr. of September 12 at 152. Dr. Rojas, however, insisted that a Bolivian court might invoke these Articles without pointing to another specific statute which a defendant had violated. He cites in support of this position the Bolivian commentator Raul Romero Sandoval:[12]

> the illegal civil acts are not listed in the Civil Code nor have they their own name. They are as numerous and unforeseeable as the diverse circumstances that life itself causes and creates. Therefore, there shall be an illegal civil act every time that a person suffers damage caused by the fault of another person.[13]

This, however, merely begs the question, for when is a person legally at "fault?" The treatise-writer Montellano states:

> Fault is the non-performance of a preexisting obligation which gives rise to reparation when it causes injury to another.... When an act is not expressly prohibited by law, it cannot be illicit, a necessary condition for it to be a fault.[14]

This latter sentence is similar to Article 32 of the Bolivian Constitution: "No one shall be obliged to do what the Constitution and laws do not mandate, or not to do what they do not prohibit."[15] And, according to Romero:

> [W]hen the pre-existing obligation is created by contract, the fault is contractual; if that pre-existing obligation has been established by statute, the fault is delictual or quasi-delictual.... Fault, in addition, can consist in an act or an omission.[16]

We thus begin with the proposition that there must be one of these types of legally cognizable "fault" on the part of the defendant before an injury will be compensable under Articles 966 and 967. What sort of "fault" is alleged here? Dr. Rojas contends that plaintiff suffered an injury cognizable under Articles 966 and 967 because defendants caused Gaensel to sell to them "the mining concessions which were already committed to be formalized as a transfer in favor of" plaintiff. First Rojas Affidavit at 4. Dr. Rojas asserted that the contract between plaintiff and Gaensel, although not judicially enforceable, was valid as a private contract under which plaintiff

---

12. Dr. Rojas testified, and Professor DeVries did not dispute, that the writings of various authors learned in legal subjects occupy much the same place in Bolivian law, and have much the same influence with Bolivian courts, as may be ascribed to case law and precedent in our legal system. Tr. of September 12 at 144, 157, 210–211.

13. Pero los hechos ilicitos civiles no estan catalogados en el Código civil ni tienen un nombre propio: son tan numerosos e imprevisibles como las diversas circunstancias que la vida mima provoca y crea; de ahí que habrá ilícito civil toda vez que una persona sufra daño a causa de la culpa de otra persona.
Raul Romero Sandoval, *Derecho Civil* (Los Amigos del Libro, La Paz, Bolivia, 1983) p. 402. The English translation, provided by Dr. Rojas, was not contested by Professor DeVries.

14. *Capitulo II "La Falta"*
1. Falta es el incumplimiento de una obligación preexistente, que da origen a la reparación cuando causa un daño a otro.
\* \* \* \* \* \*

Cuando un hecho no esta expresamente prohibido por la ley, no puede ser ilicito, condición necesaria para constituir falta...
Julian V. Montellano, *II Las Obligaciones en el Derecho Divil Boliviano* (2d ed. 1930). Translation by Professor DeVries.

15. Art. 32. Nadie sera obligado a hacer lo que la Constitucion y las leyes no manden, ni a privarse de lo que ellas no prohiban.
English translation by Professor DeVries.

16. Cuando la obligación preexistente es nacida de un contrato, la culpa es contractual; si esa obligación preexistente ha sido establecida por la ley, la culpa es delictual o cuasidelictual.
La culpa, además, puede consistir en una acción o en una omisión.
Romero, *op. cit.*, pp. 405–406. English translation by Professor DeVries (Tr. of September 12 at 216–218).

could force Gaensel to complete the formalities to raise it to an *escritura pública,* and which Gaensel had no right to terminate without judicial approval despite plaintiff's failure to comply with an express condition precedent. Tr. of September 12 at 197–202, 204–206. This would appear to be an argument of "contractual fault." However, any such fault, according to Dr. Rojas' logic and his exposition of Bolivian law, must be laid at the feet of Gaensel. According to plaintiff's contentions, it was he who took the improper or illegal steps of failing to formalize and repudiating the contract. It is not explained how the purported rights and obligations of the parties to the Gaensel-El Cid contract give the latter a cause of action in contractual fault against the *defendants,* who had no pre-existing obligation created by the contract.

Nor, it would appear, did defendants have any pre-existing obligation to plaintiff under Bolivian law. Dr. Rojas does not contend that any Bolivian statute prohibits defendants' winning of the Gaensel contract in the circumstances as alleged by plaintiff, nor has he relied in his affidavits on any statute prohibiting the actions which plaintiff alleges defendants took in furtherance of this end.[17] In short, Dr. Rojas has not provided any coherent explanation of specifically why or how a Bolivian court would find defendants to be at fault so as to invoke Articles 966 and 967. As we understand his position, he contends that plaintiff was injured by defendants' actions, and that among those injury-dealing actions were the deprivations of rights which had either vested in plaintiff or would there vest after Gaensel performed certain suspensive conditions. Even if we assume the truth of these statements, however, we do not see that they are sufficient to establish liability under Articles 966 and 967. Dr. Rojas appears to interpret the "at fault" requirement to mean simply that a party is liable where it is responsible for causing economic loss to another, whether or not there is any duty on it to refrain

from causing such loss. Giving due deference to the fact that Dr. Rojas is a practitioner of law in Bolivia, while Professor DeVries is not, we cannot see any basis for this interpretation, either in the writings of the treatises or from our own common sense. Articles 966 and 967 are perfectly comprehensible as compensatory statutes, which of course would come into play when—and only when—a party had been found to have breached some particular duty placed upon him. This interpretation is fully consistent with the treatises quoted above, and we adopt it. Under this reasoning, plaintiff has failed to demonstrate that defendants' alleged actions would be cognizable under Articles 966 and 967.

We thus turn to Article 303. We note, first, that the language of this section does not specify what actions might be considered "attacks on the freedom to work." However, the context of the Title and Chapter of the Penal Code in which it is found is illuminating. So far as we have been informed, Title X, Chapter 4 of the Penal Code of Bolivia begins with Article 303 and continues with the following four Articles:

Art. 304.—*(Monopoly of labor)*
Whoever exercises any kind of monopoly of a licit activity of labor, commerce or industry, will be sanctioned by prison of one to three years and fine of thirty to sixty days.
Art. 305.—*(Wrongful conduct)*
The public official who wrongfully permits the commission of the delicts provided for in the previous two articles will be sanctioned by prison of three months to two years.
Art. 306.—*(Violence or threats by workers and employees)*
The worker or employee who uses violence or threats to compel another or others to participate in a strike or boycott, incurs prison of three months to two years.

---

17. Dr. Rojas did discuss, during his testimony before us on September 12, 1983, several articles of Bolivian law which he asserted prohibited various of the defendants' alleged actions.

Under the law of this case, however, as described in n. 4, *supra,* these statutes are not properly before us.

Art. 307.—(*Coercion by employer, independent contractor or employee*)

The employer, independent contractor or employee who, by himself or through a third party, coerces another or others to take part in a lock-out, become a member of a determined labor or employer organization, or to leave it, will incur in the sanction of the previous article.

Prison of three months to three years will be imposed when arms have been used.[18]

Each of the quoted Articles addresses a situation in which some sort of superior power or violence is exercised by one person or entity over another. Although the situation as we described it at the beginning of this Opinion appears to us closer to a business competition situation in which one party happened to possess more experience and know-how in getting things done, plaintiff has alleged that defendants' success with Gaensel, and its failure, was in fact due not to defendants' savvy but to their threats. Specifically, plaintiff has alleged—and defendants have vehemently denied—that Gaensel abandoned his contract with plaintiff and signed with defendants because defendants assured him that they would "tie him up in endless litigation" should he choose otherwise. We have been informed by Dr. Rojas that the use of threats to prevent an individual person or company from working does fall under the ambit of Section 303, Tr. of September 12 at 175; and we have, further, been assured that a Bolivian court would view a promise of endless litigation as a threat cognizable under this section. Tr. of September 12 at 163, 175.[19]

Defendants' counsel cross-examined Dr. Rojas at some length as to precisely what might constitute a threat cognizable under Section 303, the end result of which was a determination that there appears to be no explicit definition of that term in the Bolivian legal corpus. Tr. of September 12 at 209. Further cross-examination yielded the admission that threats of a single lawsuit might not be sufficient to bring a defendant's conduct under Section 303, or any other section of Title X, Chapter 4, Tr. of September 12 at 207, 211–212; and that there might similarly be no cause of action where two competitors each threatened to sue a third party should he contract with the other, with the result that neither got the desired contract and each sued the other for this failure. Tr. of September 12 at 220–222. All of this, however, convinces us only that there is no bright line as to what is and what is not a threat which obstructs the freedom to work.

---

**18.** Art. 304.—(*Monopolio de trabajo*)

El que ejercitare cualquier tipo de monopolio de una actividad lícita de trabajo, comercio o industria, será sancionado con reclusión de uno a tres años y multa de treinta a sesenta dias.

Art. 305.—(*Conducta culposa*)

El funcionario público que culposamente permitiere la comisión de los delitos previstos en los dos artículos anteriores, será sancionado con reclusión de tres meses a dos años.

Art. 306.—(*Violencias o amenazas, por obreros y empleados*)

El obrero o empleado que ejerciere violencias o se valiere de amenazas para compeler o otro u otros a tomar parte en una huelga o boicot, incurrirá en reclusión de tres meses a dos años.

Art. 3076. —(*Coacciones por patron, empresario o empleado*)

Incurrirá en la sanción del artículo anterior el patrón, empresario o empleado que por si o por un tercero coaccionare a otro u otros para tomar parte en un lockout, ingresar a una determinada sociedad obrera o patronal, o abandonarla.

Se impondrá reclusion de tres meses a tres años, cuando se hubiere hecho uso de .armas.

**19.** Neither party has contended that the status of defendants' alleged statements as "threats," or their cognizability under Article 303, is in any way affected by the legal status of the private contract between plaintiff and Gaensel. We concur with this tacit agreement: plaintiff's claim is simply that, by making certain statements to a third party, defendants prevented plaintiff from pursuing its line of work, without regard to the status of any contractual arrangements for that work. Indeed, from the hypotheticals discussed by Dr. Rojas during his testimony, we assume that plaintiff might have made the identical claim had its dealings with Gaensel been interrupted even at the stage of preliminary discussions. Tr. of September 12 at 163–166. We therefore need not consider defendants' contention that the contract between El Cid and Gaensel, not having been raised to an *escritura pública*, was a nullity under Bolivian law and therefore gave plaintiff no rights which defendants could have violated.

As to whether the alleged conduct of defendants in this case does meet the mark, Dr. Rojas answered unequivocally in the affirmative, while defendants have contented themselves with Professor DeVries' statement that

> [a] mining concession is a state-granted monopoly under Bolivian law, and the fact that one party rather than another owns a particular concession could not conceivably be deemed to be a restraint of commerce or industry in violation of Article 303, or violative of any other provision of Chapter 4.

Affidavit in Response to Plaintiff's Submission with Respect to Bolivian Law at 9. This, however, misses the point. Plaintiff asserts that *its own* ability to work or engage in commerce was restrained by defendants, not merely that they restrained the mining industry as a whole. As such, the monopolistic aspects of mining in Bolivia would seem to be irrelevant. Professor DeVries does not explicitly quarrel with Dr. Rojas' conclusion that Article 303 can indeed encompass such private injury; and, since we consider his above-quoted statement to be a misunderstanding of plaintiff's assertion rather than a categorical denial that such a private right exists, we accept Dr. Rojas' interpretation as uncontroverted.

Dr. Rojas has asserted that it would be a question for a Bolivian court whether certain words constitute a threat, Tr. of September 12 at 167. We thus find ourselves in the position of a Bolivian judge confronted with the question of whether or not the particular statements allegedly made by defendants were sufficient to permit plaintiff to invoke the protection of Article 303. We are satisfied that no such judge would wish to decide that question on the meagre record before us, but would wish to hear evidence from which he could determine exactly what, if any, threats had actually been made. We therefore direct that such a hearing be had. Since plaintiff has not alleged any other conduct which might state a cause of action under Article 303,

the hearing will be strictly limited to this question, the resolution of which should allow us to determine both whether plaintiff has stated a cause of action and, if so, whether it will prevail upon it.

Defendants' motion for summary judgment is denied. The Court will contact the parties to establish a date for a hearing on the question of what threats, if any, were made by defendants to plaintiff relative to this action.[20]

SO ORDERED.

---

**20.** We reserve until after this hearing our decision as to whether we shall reconsider our provisional grant of summary judgment on plaintiff's first, or antitrust, cause of action.