Matthew M. Levy, J.
(I)
The central entity in this case, although not a party litigant, is Towers Marts International, Inc. Towers had leased some 18 premises from various landlords in a number of States and established shopping centers or discount stores thereon. Towers then rented portions of the premises to various so-called ‘1 concessionaires ’ ’, who conducted their respective specialty shops for the sale of separate types of merchandise in the Towers ’ stores and under the ostensible management and operation of Towers itself. As the controller in each retail store, Towers daily received the proceeds of the sales made by the concessionaires in that store. Then, acting as the over-all owner of all of the businesses, Towers centrally received all of the proceeds of all of the sales of all of the concessionaires in all of the stores. Towers would periodically pay the rent due for each store under its lease with the landlord, and, after deducting from the proceeds of the sales the agreed-upon per *620 centage thereof to be retained by Towers, would remit the net balance to the appropriate concessionaire.
In January of 1963, Towers found itself in serious financial difficulties. The concessionaires were not receiving their shares of the sales and the landlords were not receiving their rents. The concessionaires reacted immediately. On February 4, a group of five trustees (the defendants Abrams, Rubin, Narva, Gelin and Jaffee), representing the concessionaires, entered into a written agreement in New York, with Towers and its 18 subsidiary operating centers, whereby the trustees assumed control of the cash receipts of each center or store, thereby hoping to insure that each concessionaire would receive his proper share of the cash register totals. In pursuance of the agreement, an account was set up in a New York bank (under the name of the Marts Concessionaires’ Trustee Account), and Towers was to deposit each day’s receipts from each of its stores in this account, and each week the trustees would pay Towers the net rent or commissions due from the concessionaires.
The next week, February 12, a general meeting of creditors was held in New York, at which landlords, concessionaires and Towers attended — in some instances with the principals, representatives and attorneys as well. In an effort to fend off bankruptcy, Towers asked for time and capital. The creditors were dissatisfied with the Towers’ management and expressed a lack of. confidence therein. Several sessions were held. The plaintiffs allege that, at such meetings, a landlords’ committee arranged with the defendants to pay a “ new ” rent. At first the rent payable was to be 4% of sales; later, $1 a square foot of occupied space. The intent was to treat all of the landlords on an equal basis. None of this was in a writing signed by the concessionaires or their trustees or the defendants or any of them. Subsequently, allegedly confirmatory letters were written by the landlord committee’s secretary to the concessionaires’ trustees. The general thought was that some written, agreement would be executed shortly by all of the necessary parties.
Towers could not and did not pay any rents after the February meetings and it has since been adjudicated bankrupt. Some checks were paid to the landlords from the concessionaires’ trustee account during February and March, 1963, but then such payments ceased. (It seems impossible, under the proof presented, to discover precisely on what basis these checks were issued.)
The plaintiffs in this suit are the landlords who had leased or subleased three of the several premises to Towers. The defendants (other than the defendant Margolis) are the persons who *621 were the concessionaires’ trustees, which individuals were connected with various companies operating departments within the Towers’ stores. Recovery is sought from the defendants personally for the alleged balance of rents, taxes and ground rents claimed to be due the plaintiffs for the months of February and March, 1963, in pursuance of the asserted oral agreements between the defendants and the plaintiffs.
(II)
A preliminary issue of jurisdiction (raised by some of the defendants, but not briefed by counsel) must be disposed of before I proceed to a consideration of the basic facts and the substantive law applicable thereto.
The defendants Rubin and Jaffee are residents of and were served with process in New York and, of course, do not plead any objection to the in personam jurisdiction of the court over them. Of the three premises involved in this suit two are located in Maryland and one in Florida. The defendants Abrams, Margolis and Narva are residents of Connecticut, Massachusetts and Massachusetts, respectively, and were not served in New York; and they contest the jurisdiction of the court over their person, alleging in their answer that they have done no business in New York. (The remaining named defendant, Gelin, was not served with process and did not appear, and is not an actual party herein.)
CPLR 302, the so-called 1 ‘ long-arm statute ”, covers “ Personal jurisdiction by acts of non-domiciliaries,” and in subdivision (a) provides for “ Acts which are the basis of jurisdiction ”. In 1963 (when the alleged causes of action arose) and in 1964 (when this suit was instituted) it was there provided that “ A court may exercise personal jurisdiction over any non-domiciliary * * * as to a cause of action arising from any of the acts enumerated in this section, in the same manner as if he were a domiciliary of the state, if, in person or through an agent, he: 1. transacts any business within the state ”.
(HI)
The events alleged in the complaint took place prior to and in February and March, 1963. The effective date of the CPLR was September 1, 1963. This action was instituted on April 1, 1964. CPLR 302 has been authoritatively held to apply to a suit instituted after its effective date, although based on a previously accrued cause of action. (Longines-Wittnauer Watch Co. v. *622 Barnes & Reinecke, 15 N Y 2d 443, 454; see 1 Weinstein-KornMiller, N. Y. Civ. Prac., par. 302.04.)
Also, in Longines-Wittnauer (p. 454), the Court of Appeals, relying on United States v. First Nat. City Bank (379 U. S. 378, 382), held that there is “no constitutional impediment to our construction giving retroactive effect to section 302, as indicated in Simonson [14 N Y 2d 281], to the extent of applying it to a ‘ suit * * * instituted after the effective date of the statute ’ upon the basis of 1 transactions occurring before the effective date (Emphasis in original). While there may be exceptional circumstances giving rise to constitutional questions, the Court of Appeals found none in Longines-Wittnauer, and I perceive none in the present case.

(TV)

I come now to the consideration of the question as to whether the nondomiciliary defendants did “ transact any business ” in this State within the meaning of CPLR 302 (subd. [a], par. 1).
As was indicated by the Court of Appeals in the case of McKee Elec. Co. v. Rauland-Borg Corp. (20 N Y 2d 377, 381-382), “ There is no fixed standard by which to measure the minimal contacts required to sustain jurisdiction under the provisions of CPLR 302 (subd. [a], par. 1) ”. In each case, the question is whether — to use Professor Siegel’s striking expression — “the frontier was passed.” (Siegel, Conflict of Laws, 19 Syracuse L. Rev., 235, 240.) I assume, of course, that the “ frontier ” referred to is not alone that the foreign defendant can be said to have crossed over, in some insubstantial fashion, the geographical borders of our State, but in what respects he has transversed, by way of domestic activities, the lines of differentiation established by the several decisions of the Supreme Court of the United States and the Court of Appeals of New York. And this is an appropriate time to note that, under the present statute, considerably less contacts within the State are required now than under the former “ doing business ” test. (See the corresponding provision in Illinois [Smith-Hurd Ill. Ann. Stat., ch. 110, § 17]; Haas v. Fancher Furniture Co., 156 F. Supp. 564 [D. C. Ill.].) In any case “ the criteria * * * cannot be simply mechanical or quantitative. The test is not merely * * * whether the activity * * # is a little more or a little less. * * * Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws *623 which it was the purpose of the due process clause to insure.” (International Shoe Co. v. Washington, 326 U. S. 310, 319.)
I would agree with the intimation by Professor McLaughlin, in his Practice Commentary on CPLR 302 (McKinney’s Cons. Laws of N. Y., Book 7B, CPLR, p. 428) that, with the enactment of the long-arm statute, New York will “ exploit the fullest jurisdictional potential permissible under federal constitutional restraint ” (quoted in Fidelity & Cas. Co. of N. Y. v. Life Companies, 36 F. R. D. 267, 269; see McGee v. International Life Ins. Co., 355 U. S. 220, 224).
Jurisdiction there now is if the defendant can be said, as stated in McKee (supra), to have more than “infinitesimal” “ contacts ” here (20 N Y 2d 377, 382) —and to the extent, at least, of being able to determine on the facts that the cause of action upon which he is being sued has resulted from his having performed, as said in Hanson v. Denckla (357 U. S. 235, 253), ‘1 some act by which the defendant purposefully avails [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws ”.
In response to the inquiry as to whether the defendants Abrams and Narva did “transact any business” here, I find that they did. Towers had its headquarters here, and the underlying leases made with the concessionaires had announced an intention that, were any arbitration to be had with regard to disputes arising thereunder, it would be held in the City of New York and in accordance with the laws of the State of New York, with power of appointment of the third and impartial member of the arbitration tribunal given (in the event of non-agreement by the two arbitrators selected by the parties) to the then presiding or senior Justice of the Appellate Division, First Department, of the Supreme Court of this State. While these factors are not conclusive (since Towers and the concessionaires themselves are not party defendants herein), they are relevant background data. When Towers defaulted on its obligations, all categories of participants (including the contesting defendants Abrams and Narva) gathered in New York for several joint and separate business meetings, and the contracts sued upon (if any there be) were negotiated in and allegedly entered into here. Performance — if not in toto, certainly in substantial part — of these agreements would be in New York. The defendants had established the concessionaires’ trustee bank account in New York. What payments were made therefrom were to be made by checks drawn in New York.
I hold, therefore (assuming the verity of the allegations by the plaintiffs as to the transactions alleged), that this court has *624 jurisdiction to entertain this suit against the defendants Abrams and Narva. In respect of the specific facts in this case, I have, it is true, found no authoritative appellate precedent in point; but I have concluded that, while the most recent decisions rejected jurisdiction on the facts there presented, they do not lead me to a conclusion in the case at bar contrary to the one I have reached.
In Standard Wine & Liq. Co. v. Bombay Spirits Co. (20 N Y 2d 13), for example, the execution of the contract was by mail — defendant in Scotland, plaintiff in New York. The agreement provided that plaintiff, a New York corporation, was given the sole and exclusive right to sell defendant’s products in the New York metropolitan area; the goods were purchased f. o. b. Great Britain by defendant’s distributor (not its agent) in this country, which was to sell them to plaintiff. Defendant itself carried on no activities here. The court held that defendant did not “transact any business within the State,” and that the service of process upon defendant abroad was not sufficient to give our courts jurisdiction over it.
Jurisdiction was declined also in Katz & Son Billiard Prod. v. Correale & Sons (20 N Y 2d 903) where defendant in New Jersey placed orders by telephone with plaintiff in New York, and the merchandise thus ordered was shipped by plaintiff from its factory in New York City to defendant’s place of business in New J ersey.
In the McKee case (20 N Y 2d 377, supra), while the first contract (which had been renewed annually for about eight years) was negotiated and perhaps entered into in New York, the court viewed this (p. 382) as “ a consideration determinative of nothing, since the original agreement lapsed at the end of one year.” The only subsequent contact within this State was that defendant had sent officials into New York on several occasions for the purpose of alleviating frictions between plaintiff and certain of plaintiff’s customers, several of whom were codefendants. Defendant’s products, which were shipped by it f. o. b. Chicago, were used in New York by plaintiff, but that, the court said, was “ a ‘ unilateral activity ’, hardly enough standing alone to sustain jurisdiction ” (p. 382). No act of performance on the part of defendant was to be had in this State. Also, unlike the present case, the breach arose out of an act that indisputably took place in Illinois (p. 381).
In Kramer v. Vogl (17 N Y 2d 27) defendants (having, in Austria, made arrangements to sell merchandise f. o. b. European ports to the local distributor) never came into New York, but sold and sent goods into this State pursuant to an order *625 sent from here. The Court of Appeals held that the phrase “ transacts any business within the state ” does not cover the situation of these nonresident defendants.
In Hubbard, Westervelt & Mottelay v. Harsh Bldg. Co. (28 A D 2d 295) the suit was upon a note payable to plaintiff in New York in installments, some of which had been paid. But the instrument was executed and delivered in Arizona by defendant, an Oregon corporation. The court held that service of process upon defendant outside of New York did not confer jurisdiction.
In Old Westbury Golf and Country Club v. Mitchell (18 N Y 2d 670) the contract involved was executed in Ohio for the delivery of a quantity of pipe in New York. There was a preliminary conference in New York and a single delivery of pipe into New York. It was held that the court had no jurisdiction over the Ohio contracting party in that there had not been any substantial contact with this State.
None of the foregoing appellate authorities specifically applies to the alleged situation submitted to me in the instant case: i.e., where the contract (1) was negotiated, and (2) was agreed to, and (3) was to be performed — all in New York. Nor do other precedents, which I cite without discussion (Millner Co. v. Noudar, Lda., 24 A D 2d 326; Banco Espanol de Credito v. Du Pont, 24 A D 2d 445).
At nisi prius, in Patrick Ellam, Inc. v. Nieves (41 Misc 2d 186), the making of a contract in New York by a nondomiciliary defendant was held sufficient transaction of business in New York to bring defendant within the statute and to authorize valid service of process outside the State on a cause of action arising under that contract. At page 188, the court said that, in its opinion, ‘ £ the making of the contract within the State satisfies the minimum contract [sicl contemplated by the Legislature in the enactment of subdivision (a) of section 302 of the Civil Practice Law and Rules.” I need not go this far in the case at bar. Presenting facts closer to the problem under consideration is Steele v. De Leeuw (40 Misc 2d 807) where a foreign corporation, through its agent, signed a contract in New York and received delivery in New York of the shares of stock required to be transferred to it by the contract. It was held that there was a sufficient transaction of business to warrant the exercise of personal jurisdiction over the foreign corporation under CPLR 302 (subd. [a], par. 1).
In the incisive study by Professor Reese and Associate Galston, entitled ‘£ Doing an Act or Causing Consequences as Bases of Judicial Jurisdiction ” (44 Iowa L. Rev. 249 [1959]), *626 the leading decisions of the Supreme Court of the United States were analyzed and, in respect of those holding the long-arm statute involved not constitutionally invalid, were — from a realistic point of view — stated to be based upon overriding principles of public interest, police power, forensic facility or sovereign control. Thus, it was “in the public interest” to sustain jurisdiction over a nonresident motorist who causes injury while in the State of the forum (Hess v. Pawloski, 274 U. S. 352; Olberding v. Illinois Cent. R. R. Co., 346 U. S. 338); that “ the business of dealing in corporate securities [is] exceptional, and subjects it to special regulation ” (Doherty & Co. v. Goodman, 294 U. S. 623, 627); that “ the interest of each state in providing means to close [common] trusts that exist by the grace of its laws and are administered under the supervision of its courts is so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants, resident or nonresident, provided its procedure accords full opportunity to appear and be heard ” (Mullane v. Central Hanover Bank & Trust Co., 339 U. S. 306, 313); and that, where an insurance policy is delivered in the State of the forum, premiums were paid by the insured by mailing from there, and when he died he was a resident of the forum State, that State ‘ ‘ has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay their claims ” (McGee v. International Life Ins. Co., 355 U. S. 220, 223, supra).
The authors nevertheless conclude, by way of forecast, that “ There will be rare occasions * * * when the doing of a single non-tortious act in a state will not give that state judicial jurisdiction over the actor”, and that “ All that can be said perhaps of non-tortious acts, which do not fall within the scope of a state’s police power, is that the state will have jurisdiction over the actor in cases where this would be reasonable ’ ’ (44 Iowa L. Rev. 259-260). I would agree, although I must keep in mind that, in a comparatively recent decision, the Appellate Division pointed out that ‘ ‘ the obvious care with which the new section was drafted makes it clear that the Legislature did not intend to extend the McGee principle to commercial contracts generally” (Millner Co. v. Noudar, Lda., 24 A D 2d 326, 330, supra), and what is judicially “ reasonable ” in any specific instance may well be problematical.
(V)
It is my view that, in respect of the issue of due process, the maintenance of this suit against the defendants Abrams and *627 Narva “ does not offend ‘ traditional notions of fair play and substantial justice ’ ” (International Shoe Co. v. Washington, 326 U. S. 310, 316, supra), and that it is “ reasonable ” on the facts that this court exercise jurisdiction over them in the case at bar.
But actor there must be, in my opinion, and his act must have some adequate relationship to the State of the forum. The pronouncements of the Court of Appeals of this State and of the Appellate Division obviously do not warrant the assumption that long-arm jurisdiction may be invoked for the mere asking. ('See the analysis of the New York appellate cases in Friedr. Zoellner [N. Y.] Corp. v. Tex Metals Co., 396 F. 2d 300.) That places the defendant Margolis (who, it will be recalled, also contested jurisdiction) in an entirely different status. There is no proof that he was in New York at any time in connection with the transactions involved herein. And, as has been hereinbefore noted, he was not a member of the concessionaires’ trustee group, and did not sign the agreement in that regard. If he participated at all, in that aspect or in the later conferences, negotiations and alleged oral agreements, it was by way of long distance and not presence.
The due process clause “ does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties ■or relations ”. (International Shoe Co. v. Washington, 326 U. S. 310, 319, supra; see Reese and Galston, “ Doing an Act or Causing Consequences as Bases of Judicial Jurisdiction ”, 44 Iowa L. Rev. 249, 251, 255-256, supra; and the discussion in Schwartz v. Breakers Hotel Corp., 13 Misc 2d 508, 511-513.)
In Hanson v. Denckla (357 U. S. 235, supra) it was held, on the facts there presented, that Florida, the forum State, did not have in personam jurisdiction over a Delaware trustee, the majority of the court indicating the importance of the fact that the foreign trustee had not initiated a transaction in Florida. In the law review article just cited, the authors express doubt that the court had “ arrived at the correct result ”, for “ Personal jurisdiction could be obtained in Florida over the great majority of the interested parties, and this state would have afforded * * * the most convenient forum for the trial of the suit.” And then they make the inquiry: “ Should not the rules for obtaining judicial jurisdiction over an absent party be liberalized somewhat in such a situation if, by this means, the forum could determine the entire controversy and thus obviate the need for multiple litigation? ” (44 Iowa L. Rev. 257). “ This argument,” say the authors, “ seems particularly persuasive in *628 a case such as Denchla, where the absent party has no pecuniary or other tangible interest in the outcome of the suit. He would suffer no real harm if he did not appear at the trial at all. Hence considerations of reasonableness would seem to indicate that his interest in having the trial at a place convenient to him should be subordinated, at least to some extent, to the interests of those who have more at stake.” (44 Iowa L. Rev. 257-258.)
Suffice it to say, so far as the instant case is concerned, first, that CPLR 302 (the operative rule on this point in New York) does not so provide, and therefore whether such an extension of the long-arm statute would be constitutional vis-a-vis the absent foreign defendant is not now before me for disposition; and second, that Margolis and the other defendants are sued here not as disinterested trustees or mere stakeholders but as contracting parties who allegedly made agreements on their own account or as agents for others, and the plaintiffs seek recovery from these defendants personally.
Accordingly, the plea interposed by Margolis contesting the jurisdiction of the court over his person is sustained.
(VI)
All of the answering defendants advance the Statute of Frauds as a bar. The plaintiffs contend that the contracts allegedly made by the defendants with the plaintiffs had the effect of leases from week to week or at least for a period of less than a year. If the facts as proved supported the claim of a leasing, then, insofar as rights in rem in the land are established, that would be in the nature of a chattel real (see Matter of Fort Hamilton Manor v. Boyland, 4 N Y 2d 192, 197; see, also, 33 N. Y. Jur., Landlord and Tenant, §§ 2, 3), the validity, existence or efficacy of which might be thought to be governed by the law of the situs of the land (Matter of Barnett, 12 F. 2d 73,76 [C. A. 2d], cert. den. sub nom. United Cigar Stores v. Rayher, 273 U. S. 699; 33 N. Y. Jur., Landlord and Tenant, § 5; see, also, James v. Powell, 19 N Y 2d 249), and that would then be the law which would determine the rights and duties of the parties to the lease (2 Beale, Conflict of Laws [1935 ed.], p. 943, § 222.1). Insofar as the lease establishes rights in personam, the law of the State of New York — as the place having “ the most significant relationship to the transaction and the parties ” (Restatement, 2d, Conflict of Laws, Proposed Off. Draft, Part II, May 1, 1968, ch. 8, § 188) and as the lex loci contractus (Matter of Barnett, supra, pp. 76-77; Mallory Assoc. v. Barving Realty Co., 300 N. Y. 297, 300-301) — unquestionably applies.
*629 (VII)
In any case, as I find the facts to be, they do not sustain the plaintiffs’ construction of the oral agreements allegedly entered into. It will be recalled that the plaintiffs and Towers were respectively landlords and lessee, and that Towers and the concessionaires were, in turn, landlord and lessees (or licensees). The leases between the plaintiffs and Towers allowed, on notice, summary cancellation and eviction in case of default. There was default, but such notice was never given, at least during the period for which the plaintiffs claim rents from the defendants— February and March, 1963. These principal leases, therefore, continued to exist during that period. Indeed, proofs of claim for such rents under these leases were filed by one of the plaintiffs in the bankruptcy court administering the Towers ’ affairs. And it is not to be assumed that the plaintiffs leased the same properties for the same time, both to Towers and to the defendants. Nor were the defendants licensees or tenants of Towers (see Marburt Holding Corp. v. Picto Corp., 5 A D 2d 617). They are individuals who (though having, it is true, executive business connection with some of the concessionaires) did not lease the premises from the plaintiffs. And there was no novation. I have come to the conclusion on the evidence (even on the assumption that the plaintiffs’ testimony is acceptable as proven fact), that what we are presented with are alleged agreements whereby the defendants agreed or guaranteed or assumed to pay the debts of another,-or agreed to make good the defaults or miscarriages of that other. And the fact that the obligation of the other concerns the rents payable under leases of realty in other States does not, in my view, involve any problem touching upon the choice of the applicable law. Thus it is that I need not consider the applicability of the Statute of _ Frauds of either Maryland or Florida, the States wherein are situated the properties owned by the plaintiffs and leased by them to Towers.
(VIII)
But there is posed for adjudication, in the light of the credible evidence, what appears to me to be a classic case within a section of the New York Statute of Frauds. That provision — in 1963, the time here involved — -was section 31 of the Personal Property Law (now General Obligations Law, § 5-701) reading as follows: ‘1 Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: * * *
*630 “2. Is a special promise to answer for the debt, default or miscarriage of another person ”.
The testimony most favorable to the plaintiffs shows that what is being sought to be enforced by them is an oral contract to answer for the debt of another. That would clearly be unenforcible under the Statute of Frauds and, perhaps, recognizing this obstacle, the plaintiffs argue that they rely upon an independent contract, with independent consideration, and therefore, it is urged, the agreement does not come within the interdiction of the statute. But the plaintiffs ignore several principles of law in making this argument.
(IX)
It is one of the plaintiffs’ major contentions on this score that the consideration for the defendants’ entering into an agreement to pay the “new” rent was the fact that the plaintiffs would forbear from foreclosing or evicting the prime tenant, Towers, from possession, thus resulting in not dispossessing the concessionaires from so much of the premises which they occupy.
But it is clear (as expressed in 56 N. Y. Jur., Statute of Frauds, § 54, pp. 97-98) that: “ While forbearance may be good consideration for a contract in general, a promise made by one person to pay the existing debt of a third person is not rendered independent of the original obligation so as not to be within the statute of frauds, by the mere fact that it is based upon the creditor’s forbearance to sue the debtor or upon the dismissal of a suit which the creditor had instituted against the debtor, because in such cases forbearance consists only in harm to the promisee whereas a consideration moving to and beneficial to the promisor is required to make an oral promise enforcible under the statute of frauds. ’ ’
In Newton v. Van Ingen (21 A D 2d 425) the action was dismissed as barred by section 31 of the Personal Property Law, unless the agreement or some memorandum thereof was in writing and signed by the party to be charged, or (p. 427):
‘ ‘ unless there was a new consideration and beneficial interest moving to the promisor which created an independent personal obligation to pay, irrespective of the liability of the principal debtor — both of which are necessary to take a promise to answer for the debt of another out of the Statute of Frauds. * * *
“ Forbearance to sue the original debtor is not such consideration as will make the oral promise of another enforcible. ” (See, *631 also, Keybro Enterprises v. Four Seasons Country Club Caterers, 25 A D 2d 307, 310-311).
Further (quoting from 56 N. Y. Jur., Statute of Frauds, § 52, pp. 94-95): “ The mere .fact that an oral promise to pay the debt of another is upon adequate consideration does not take it out of the statute of frauds, at least if such consideration consists merely of harm to the creditor and is not beneficial to the promisor, unless the consideration is the discharge of the original debtor. Otherwise, the statute would have no operation, since consideration is essential to the enforceability of any promise. ’ ’
And section 53 (pp. 95-96) states that: “A promise may still be collateral even though no consideration moves to the promisor and is beneficial to him. Thus, although it is true that the elements of beneficial interests and new consideration must be present to take the case out of the statute, nevertheless the inquiry remains whether the consideration is such that the promisor thereby comes under an independent duty of payment irrespective of the liability of the principal debtor.”
A leading case on this point is Bulkley v. Shaw (289 N. Y. 133). The court, citing Richardson Press v. Albright (224 N. Y. 497), Mallory v. Gillett (21 N. Y. 412) and quoting from Witschard v. Brody & Sons (257 N. Y. 97, 99), said at pages 138 to 139: “A promise to guarantee the account of another, like every promise, requires the support of a consideration paid or promised, in order that an enforceable contract may have been formed. To say that the payment of a consideration removes an oral contract of guarantee from the application of the statute is to say that the statute can never operate, for there is no such thing as a contract without consideration. (1 Williston on Contracts, § 472.) Prof. Williston says: ‘ The true test of the validity of a new oral promise should be: Is the new promisor a surety? ’ (Id. § 475.) If, as between the promisor and the original debtor the promisor is bound to pay, the debt is his own and not within the statute. ‘ Contrarkvise, if as betiveen them the original debtor still ought to pay, the debt cannot be the promisor’s own and he is undertaking to anstver for the debt of another’ (Id.) ” (Emphasis in original.)
It may be that — if it be the fact that the plaintiffs agreed not to evict Towers from possession in return for the defendants’ alleged oral promise — there might thus be a remote and insubstantial, albeit likely consequential, benefit to the defendants in that their employers, the concessionaires they represented, would continue in peaceable possession of their minor portions of the respective premises without the presence and activity of a running over-all business thereon. Even were that to be so, it is *632 my view that this indirect peripheral benefit to the promisor is not of that nature or quality as to come within the ambit of the established rule “ that the benefit to the promisor sufficient to render the debt his own, thereby taking the obligation out of the Statute, must be substantial. Slight and indirect possible advantages will not suffice ” (3 Williston, Contracts, [3d ed., Jaeger], § 473, p. 438; see, also, Richardson Press v. Albright, 224 N. Y. 497, 601, supra).
Applying these principles to the case on trial, I conclude that the plaintiffs’ alleged promise to forbear from instituting suit to procure the eviction of Towers as the claimed consideration to take the promise out of the bar of the Statute of Frauds is insufficient. Since the original lease with Towers continued in existence, Towers remained primarily liable for the debt or rent due under the lease. From at least one letter in evidence it appears that the concessionaires’ trustees committee indicated that the rent was being paid from their account solely as a convenience for Towers, and in the interest of the landlords, as there was apprehension that any check on a Towers account might not be honored by the bank. Aside from that, proof was introduced into evidence that a letter of authorization from Towers was procured before the defendant trustees would pay moneys to various landlords on Towers ’ behalf.
(X)
The plaintiffs also seek to charge the individual defendants with liability on the basis that they undertook to represent all the concessionaires, and that they made the agreement sued upon as agents. This contention, too, is rejected — 'both on the law and on the facts. An agent is not to be held personally on the contracts of his principal unless he explicitly signs it in an individual capacity. Thus, in Savoy Record Co. v. Cardinal Export Corp. (15 N Y 2d 1) a case where the written contract expressly included liability of the agent, the court held that the agent was not liable on the contract since it had been signed as “agent”. Similarly in Salzman Sign Co. v. Beck (10 N Y 2d 63) the contract provided that: “Where the Purchaser is a corporation, in consideration of extending credit to it, the officer or officers signing on behalf of such corporation, hereby personally guarantee the payments hereinabove provided for.” The contract was signed by ‘ ‘ Irving Beck, Pres. L. S. ” In spite of the language of the contract, Beck, the president, was held not personally liable. At page 67, the court said: “ We think that precedent and policy require an affirmance here. In modem times most commercial business is done between corporations, *633 everyone in business knows that an individual stockholder or officer is not liable for his corporation’s engagements unless he signs individually, and where individual responsibility is demanded the nearly universal practice is that the officer signs twice — once as an officer and again as an individual. There is gréat danger in allowing a single sentence in a long contract to bind individually a person who signs only as a corporate officer.”
Again applying these principles to the case presented for decision, I think it is reasonably clear on the testimony that the plaintiffs knew the limited status of the individual defendants, and realized that the defendants did not intend to bind themselves personally in this matter or make any representations to that effect.
(XI)
Even if all that has been hereinbefore expressed by me as being a bar to recovery in this action, is incorrect as a matter of law, it is plain to me — upon all of the proof adduced at the trial — that the experienced real estate operators, businessmen and lawyers who were involved in these transactions did not engage themselves in any firm understanding, but were negotiating and making tentative and halting arrangements with the view of entering into a definitive agreement, which obviously would include many important terms and would be in writing, to be executed by the principals. And even if there were any actual oral agreement made by these plaintiffs and these defendants, or on their behalf, as alleged, it was vague and uncertain as to any claimed executory features thereof and therefore unenforcible.
(XII)
For all of the above reasons, each, as I see it, valid on its own, I hold that the plaintiffs have failed to establish their claims. Judgment on the merits is rendered accordingly dismissing the complaint, and all of the causes of action pleaded therein, on the law and on the facts.