**DRUTMAN REALTY. COMPANY LIMITED PARTNERSHIP,**
Plaintiff,

v.

**JINDO CORPORATION, and Jindo Ventures Corporation,**
Defendants.

No. 93 Civ. 1125 (SWK).

United States District Court,
S.D. New York.

Nov. 2, 1994.

Katz, Kleinbaum, Farber & Segall by Clifford G. Kleinbaum, Thomas Brunt, White Plains, NY, for plaintiff.

Kelley Drye & Warren by John Patrick Marshall, Jonathan K. Cooperman, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this dispute involving a commercial lease agreement, plaintiff Drutman Realty Company Limited Partnership ("Drutman Realty") moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it summary judgment. Defendants Jindo Corporation and Jindo Ventures Corporation (collectively, "Jindo") oppose the motion and cross-move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting them summary judgment dismissing the complaint and awarding relief on their First through Fifth

Counterclaims. For the reasons set forth below, both motions are denied.

### BACKGROUND [1]

### I. The Lease

Drutman Realty owns a 21,000–square–foot retail store located in Paramus, New Jersey (the "retail premises").[2] In August 1983, Drutman Realty's predecessor-in-interest, Drutman Enterprises, Inc., entered into a written lease agreement with F.S. Paramus Corp. ("F.S. Paramus") which provided for a ten-year leasing period followed by option periods extending for an additional thirty years (the "Lease"). *See* Lease, annexed to the Affidavit of Ralph Drutman, sworn to on Jan. 18, 1994 (the "Drutman Aff.") as Exh. "4," at 67.

In the 1980s, F.S. Paramus was in the retail fur sales business, operating a chain of stores called The Fur Vault. At the time the Lease was executed, the retail premises consisted of empty retail space. F.S. Paramus immediately decided to improve the retail premises in order to create a more favorable atmosphere for selling furs. Accordingly, F.S. Paramus spent over $1 million in renovations before opening The Fur Vault store.[3] According to defendants, the renovations consisted of trade fixtures and property to which ownership was never forfeited. Drutman Realty contends, however, that the renovations were not trade fixtures, but rather were leasehold improvements that now belong to Drutman Realty as the owner of the retail premises.

### II. Meridian's Acquisition and the Jindo Guaranty

On May 25, 1990, Meridian Fashions Corp. ("Meridian") acquired F.S. Paramus and certain assets of The Fur Vault (the "acquisition"). As part of the acquisition, F.S. Para-

---

1. Unless otherwise indicated, the following statement of undisputed facts is derived from Plaintiff's 3(g) Statement of Material Facts; Defendants' 3(g) Statement of Material Facts; and Defendants' Brief in Opposition to Plaintiff's Motion and in Support of Defendants' Motion.

2. The retail premises consists of an 18,000–square–foot ground floor and a 3,000–square–foot second floor.

3. The renovations included adding removable track, recessed and spot light fixtures, video monitoring equipment, a security system, kitchen equipment, glass casings, interior columns, storage units, tables, fluorescent lighting, Fur Vault signs, showcases, wood and slat walls, glass and marble partition walls, mirrors and marble floors and platforms (collectively, the "renovations").

mus assigned to Meridian the Lease, which contained a remaining lease term of approximately forty-three months, as well as option periods totaling an additional thirty years.[4] *See* Assignment and Assumption of Lease, annexed to the Drutman Aff. as Exh. "5." That same day, Jindo entered into a written guaranty with Drutman Realty in which Jindo agreed to guarantee Meridian's payments to Drutman pursuant to the Lease (the "Guaranty"). *See* Guaranty, annexed to the Drutman Aff. as Exh. "6."

In determining a fair price for the acquisition, Meridian hired the accounting firm of Coopers & Lybrand to analyze the fair market value of the retail premises, including the renovations. Coopers & Lybrand concluded that the renovations had a fair market value of $4,105,300. *See* letter from Coopers & Lybrand to Y.W. Lee of 1/27/92, annexed to the Affidavit of William Weinberg, sworn to on Feb. 23, 1994 (the "Weinberg Aff.") as Exh. "A."

### III. The Lease Default

Shortly after the acquisition, The Fur Vault began to experience financial difficulties due to the declining economy and changing attitudes toward the fur industry. In 1991 and 1992, after losing millions of dollars in the retail fur sales business, Meridian decided to close thirty-five of its approximately forty Fur Vault stores. In February 1992, Meridian closed The Fur Vault at the location owned by Drutman Realty, retaining possession of the key to the retail premises. Thereafter, Meridian continued to pay rent as well as other monthly charges pursuant to the Lease, including sewer rent, real estate taxes and insurance premiums. In October 1992, however, Meridian defaulted on the rent and ceased to make any other payments required by the Lease.

On November 10, 1992, Drutman Realty sent to Meridian a Notice of Termination of the Lease stating that the Lease would terminate on November 27, 1992. *See* letter from Drutman Realty to Meridian of 11/10/92, annexed to the Weinberg Aff. as Exh. "B." In response, on November 17, 1992, Meridian sent a letter to Drutman Realty requesting that the parties agree on a pay-out schedule for the remainder of the Lease. *See* letter from Meridian to Drutman Realty of 11/17/92, annexed to the Weinberg Aff. as Exh. "C." Drutman Realty did not respond to this letter.

On December 11, 1992, Drutman Realty sought a Judgment of Possession against Meridian in New Jersey state court. On December 18, 1992, the Judgment of Possession was issued and Drutman Realty entered the retail premises with the county sheriff, thereby locking out Meridian. According to defendants, Drutman Realty had promised to allow Meridian to remain in possession of the retail premises until December 31, 1992.

On January 4, 1993, Meridian informed Drutman Realty that it intended to remove its trade fixtures and property from the retail premises. *See* letter from Meridian to Drutman of 1/4/93, annexed to the Weinberg Aff. as Exh. "F." In its letter, Meridian stated that it was entitled to repossess its trade fixtures and property pursuant to Section 4.03 of the Lease ("Lease Section 4.03"), which provides:

> It is understood and agreed that if Lessee abandons the premises or moves out upon the expiration of this lease or after default in payment of rent or in violation of any provisions of this lease, it is dispossessed and a final order is entered, and after any of the said events, fails to remove any of its trade fixtures or property from the demised premises at the end of thirty (30) days therefrom, at the option of the Lessor, the fixtures and the property shall be deemed abandoned by Lessee and shall become the property of the Lessor.

Lease, annexed to the Drutman Aff. as Exh. "4," at 8. In response, Drutman Realty notified Meridian that it would not allow any re-entry upon the retail premises. *See* letter from Drutman Realty to Meridian of 1/8/93, annexed to the Weinberg Aff. as Exh. "G."

---

**4.** Plaintiff indicates that there were thirty-one months remaining on the Lease at the time of the acquisition. This appears to be a miscalculation, however, as Plaintiff's 3(g) Statement confirms that Meridian was assigned the Lease in May 1990 and the Lease was due to expire in December 1993.

Thereafter, Drutman Realty paid an independent contractor to remove all of the renovations installed by F.S. Paramus.

## IV. The Search for a New Tenant

Beginning in late 1991, at about the time the decision was made to close The Fur Vault at the location owned by Drutman Realty, Meridian retained several real estate brokers to find an assignee or subtenant for the remainder of the Lease. Specifically, Meridian hired Sharon Satlin–Shahar ("Satlin–Shahar") of Okada International Corporation to negotiate with several prospective subtenants. Satlin–Shahar engaged in substantial negotiations with The Container Store and Leewards Creative Crafts ("Leewards") and contacted at least fifteen other retailers, including Annie Sez, Coconuts, Pathmark Drugs, Rockbottom and Burlington Coat Factory. *See* letter from Satlin–Shahar to Drutman of 12/22/92, annexed to the Weinberg Aff. as Exh. "H."

Meridian also held discussions with several other real estate brokers, including Evergreen Agency, E. Grodberg & Son, Gabriel Realty, Fogarty/Baily & Associates, Wilson–Comp Associates and Michael Antkies Real Estate. In December 1991, Michael Antkies ("Antkies") of Michael Antkies Real Estate notified Meridian that The Discovery Zone, a retail chain of children's entertainment centers, had expressed interest in assuming the Lease.[5] *See* letter from Antkies to Meridian, annexed to the Weinberg Aff. as Exh. "K." Drutman Realty and The Discovery Zone were unable to come to terms, however, as Drutman Realty sought a rental rate of approximately twenty dollars per square foot rather than a continuation of the $12.65 per square foot rate paid by Meridian pursuant to the Lease.

According to Michael Evans ("Evans"), Drutman Realty's real estate broker, Ralph Drutman "was serious about wanting to net twenty" dollars after commission. *See* deposition of Michael L. Evans, taken on Dec. 1, 1993, annexed to the Weinberg Aff. as Exh. "T," ("Evans Dep.") at 41. This required a

rental price of approximately twenty-two dollars per square foot. *Id.* Evans described this price as "a little bit aggressive, but not out of what I call the gray area." *Id.* at 29. Several other retailers, including A & E Stores and Steven Cohn Furs, expressed an interest in the retail premises but were unable to reach an agreement with Drutman Realty because the asking price was too high. *Id.* at 43–44, 57–59.

Jindo claims that Drutman Realty's failure to reach an agreement with any of the prospective tenants constitutes a failure to mitigate damages which should offset any potential recovery. According to Drutman Realty, however, the Lease expressly relieves it of any duty to mitigate damages. Specifically, Drutman Realty relies upon Section 14.04(b) of the Lease ("Lease Section 14.04(b)"), which states:

> In case of any default, re-entry, expiration or dispossess [sic] by summary proceedings or otherwise Lessee shall be liable for each of the following and such remedies of Lessor are not mutually exclusive, (b) Lessor may relet the premises or any part of parts thereof (but Lessor is not obligated to relet), either in the name of the Lessor or otherwise.

Lease, annexed to the Drutman Aff. as Exh. "4," at 33. Specifically, Drutman Realty argues that the phrase "but Lessor is not obligated to relet" expressly relieves it of any duty to mitigate damages by finding a new tenant to replace the defaulting a tenant.

Finally, on June 3, 1993, Drutman Realty reached an agreement with Leewards, the retailer first contacted by Meridian in late 1992. Under the lease agreement between Drutman Realty and Leewards, Leewards is obligated to pay fifteen dollars per square foot during the first two years, sixteen dollars per square foot during the next two years with the rent price gradually rising thereafter.

---

5. The parties dispute whether The Discovery Zone was interested in the entire retail premises. According to Drutman, The Discovery Zone was only interested in the first floor, covering 18,000 of the 21,000 square feet. Jindo, in contrast, argues that The Discovery Zone was interested in leasing the entire retail premises.

## V. The Present Action

On February 26, 1993, Drutman Realty commenced this action seeking payment from Jindo, as guarantor of Meridian's payment obligations, pursuant to the Guaranty and the Lease, for the: (1) unpaid rent and late charges on the remainder of the Lease (First Claim for Relief); (2) unpaid sewer rent, real estate taxes and connected late charges (Second Claim for Relief); (3) unpaid insurance premiums associated with the sewer rent and real estate taxes (Third Claim for Relief); (4) alleged physical damage to the retail premises caused by Meridian (Fourth Claim for Relief); (5) expenses incurred in reletting and repairing the retail premises for a new tenant (Fifth Claim for Relief); and (6) attorney's fees incurred in recovering these amounts due (Sixth Claim for Relief).

On April 15, 1993, Jindo filed its answer to the complaint, denying Drutman Realty's allegations and setting forth five counterclaims. First, Jindo alleges that Drutman Realty unreasonably refused to accept The Discovery Zone as a tenant, thereby breaching an implied covenant of good faith and fair dealing. Accordingly, Jindo seeks a judgment declaring that Meridian and Jindo are no longer obligated to render performance under the Lease and Guaranty (First Counterclaim).

Second, Jindo alleges that Drutman Realty has failed to mitigate damages prior to seeking collection under the Guaranty (Second Counterclaim). Third, Jindo claims that Drutman Realty's refusal to lease the retail premises to The Discovery Zone amounts to tortious interference with Jindo and Meridian's business dealings (Third Counterclaim). Fourth, Jindo alleges that Drutman Realty breached the Lease by failing to allow Meridian to recover the renovations installed at the retail premises. Accordingly, Jindo seeks a judgment declaring that any remaining obligation under the Guaranty be offset against the value of the renovations retained by Drutman Realty (Fourth Counterclaim). Fifth, Jindo alleges that Drutman Realty's

refusal to return the renovations to Meridian constitutes a conversion of property (Fifth Counterclaim).

Drutman Realty now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it summary judgment. Jindo opposes the motion and cross-moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it summary judgment dismissing the complaint and awarding recovery on the First through Fifth Counterclaims.[6] For the reasons set forth below, both parties' motions are denied.

## DISCUSSION

### I. Standard of Law

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the nonmoving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmoving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

**6.** Although portions of Jindo's motion papers indicate it is seeking summary judgment on the Fourth and Five Counterclaims only, other sections indicate that Jindo also seeks a summary judgment order with respect to the First through Third Counterclaims. Accordingly, the Court will address Jindo's motion for summary judgment on all five counterclaims.

■ The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. at 158–59, 90 S.Ct. at 1608–09; *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1223 (2d Cir.1994). But the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *see Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12–15 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

■ To determine whether the moving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.*, but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of summary judgment. *See,*

e.g., *Knight v. United States Fire Ins. Co.*, 804 F.2d at 11–12.

■ Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to establish his or her burden under Rule 56. *Celotex Corp. v. Catrett*, 477 U.S. at 330 & n. 2, 106 S.Ct. at 2556 & n. 2 (Brennan, J., dissenting). In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

## II. Mitigation of Damages [7]

The principal dispute between the parties involves whether Drutman Realty properly mitigated damages after Meridian's default on the Lease. According to Drutman Realty, Lease Section 14.04(b) expressly relieves it of any obligation to mitigate damages by reletting the retail premises upon Meridian's default. Jindo disagrees and argues that, even if Lease Section 14.04(b) does so provide, it is unenforceable under New Jersey law.

### A. Duty Under New Jersey Law [8]

■ As a threshold matter, the Court must determine whether New Jersey law requires a commercial lessor to mitigate damages after a tenant defaults on a lease agreement. For the reasons that follow, the Court finds that there is such an obligation inherent in all commercial leases in New Jersey.

---

**7.** Drutman Realty argues that Jindo does not have standing to assert any defense or counterclaim on Meridian's behalf. Drutman Realty's argument is without merit, however, as Meridian has expressly assigned its causes of action to Jindo. *See* Assignment Agreement, annexed to the Affidavit of Jonathan K. Cooperman, sworn to on April 19, 1994, as Exh. "C."

**8.** The parties agree that the Lease is subject to interpretation under New Jersey law as the retail premises are located in New Jersey. *See Carrolton Assocs. v. Abrams*, 57 Misc.2d 617, 293 N.Y.S.2d 159, 168 (N.Y.Sup.Ct.1968) (stating that the law of the state in which the property is located governs the rights and duties of the parties to a lease).

Under New Jersey law, it is well-settled that "a landlord has a duty to mitigate damages where he seeks to recover rents due from a defaulting tenant" in the residential lease context. *Sommer v. Kridel,* 74 N.J. 446, 378 A.2d 767, 773 (1977). This rule is based upon the recognition that "modern notions of fairness and equity" do not permit a landlord "to stand idly by the vacant, abandoned premises and treat them as the property of the tenant and recover full rent." *Id.*

In *McGuire v. City of Jersey City,* 125 N.J. 310, 593 A.2d 309, 314 (1991), the New Jersey Supreme Court extended the rule requiring landlords to mitigate damages to the commercial context. Accordingly, it is now firmly established that, under New Jersey law, "a commercial lessor is governed by the same rule of mitigation of damages that applies to a residential lessor." *Id.; see also Fanarjian v. Moskowitz,* 237 N.J.Super. 395, 568 A.2d 94, 98–99 (N.J.Super.Ct.App.Div.1989) (stating that "reason and logic, as well as public policy, support the extension of the mitigation of damage requirements to commercial lease settings"). Thus, the Court finds that, under New Jersey law, commercial landlords are required to mitigate damages.

**B. Contract Principles**

■ Having concluded that New Jersey law implies a duty to mitigate damages in every commercial lease, the Court must next determine whether the parties to a commercial lease can expressly eliminate this duty as part of their lease agreement. Drutman Realty argues that the parties to a commercial lease may contract away the landlord's implied duty to mitigate. Jindo disagrees and argues that the duty to mitigate damages is absolute in New Jersey and is not subject to the parties' agreement to the contrary. After reviewing the relevant New Jersey case law, the Court finds that a commercial lessor in New Jersey may not contract away its duty to mitigate damages.

In *Carisi v. Wax,* 192 N.J.Super. 536, 471 A.2d 439 (Bergen Dist.Ct.1983) (*"Carisi"*), a New Jersey lower state court held that the

parties to a commercial lease may, by contract, "obviate [the] tenant's right to have the landlord mitigate damages." *Id.,* 471 A.2d at 443. The *Carisi* court based its decision on the premise that leases are governed by contract law rather than the rules regarding conveyances of land. *Id.* In *Carter v. Sandberg,* 189 N.J.Super. 42, 458 A.2d 924 (Burlington Dist.Ct.1983) (*"Carter"*), however, another New Jersey lower state court also applied contract principles to the mitigation issue, concluding that public policy forbids any lease provision relieving a landlord of the duty to mitigate damages. The *Carter* court based its determination on the "strong public policy" in favor of ensuring that a landlord make reasonable efforts to mitigate damages. *Id.,* 458 A.2d at 926.

No other New Jersey court has directly addressed the issue of whether the leasing parties may expressly discharge the landlord's duty to mitigate damages. In fact, in *Fanarjian v. Moskowitz,* 568 A.2d at 99–100, the New Jersey Superior Court refused to reach the discharge issue, instead deciding to "leave that determination for a case in which the issue is squarely presented." *Id.* Two years later, in *McGuire v. City of Jersey City,* 593 A.2d at 314, the New Jersey Supreme Court referred parenthetically to *Carisi*'s holding that a "commercial lessor has [a] duty to mitigate, at least in [the] absence of any contractual provision relieving [the] landlord of such duty." *Id.* The court, however, did not indicate whether it agreed with the *Carisi* court's determination.

Based upon *Carisi* and *Carter* and the limited discussion by the New Jersey Supreme Court in *McGuire v. City of Jersey City,* this Court is now confronted with determining how New Jersey courts would decide the discharge issue. At the outset, the Court finds that the New Jersey Supreme Court's reference to *Carisi* in *McGuire v. City of Jersey City* provides little insight into the probable outcome of the discharge issue in New Jersey.[9] Rather, the Court will look to the treatment of commercial leases under New Jersey law generally in order to determine whether the parties to a commercial

---

**9.** The court parenthetically cited *Carisi* merely for the proposition that "on several occasions lower courts have extended the mitigation rule to commercial leases." *Id.*

lease may contract away the landlord's duty to mitigate damages.

■ In reviewing the treatment of commercial leases under New Jersey law, the Court finds that the common theme has been an adherence to contract principles over property law in determining the rights and obligations of the landlord and tenant. For example, in *McGuire v. City of Jersey City*, 593 A.2d at 315, the New Jersey Supreme Court, in deciding to extend the mitigation of damages duty to commercial leases, noted that "in recent years, New Jersey and other jurisdictions have shown an increasing tendency to analogize landlord-tenant law to conventional doctrines of contract law." *Id.* Similarly, in *Sommer v. Kridel*, 378 A.2d at 771, the New Jersey Supreme Court stated that "the distinction between a lease for ordinary residential purposes and an ordinary contract can no longer be considered viable." *Id.* The court stated further that "[t]here is a clearly discernible tendency on the part of courts to cast aside technicalities in the interpretation of leases and to concentrate their attention, as in the cases of other contracts, on the intentions of the parties." *Id.* at 772; *see also Berzito v. Gambino*, 63 N.J. 460, 308 A.2d 17, 21–22 (1973) (applying contract principles of implied warranty of habitability and covenant to pay rent to lease agreement); *Marini v. Ireland*, 56 N.J. 130, 265 A.2d 526, 534 (1970) (construing landlord's implied covenant to make repairs and tenant's covenant to pay rent as mutually dependent under general contract principles); *Reste Realty Corp. v. Cooper*, 53 N.J. 444, 251 A.2d 268, 272–73 (1969) (recognizing implied warranty against latent defects and of fitness of premises for lease purposes).

■ Thus, the Court shall rely upon standard contract law in order to determine the parties' rights to contract away the landlord's duty to mitigate damages. Under accepted principles of contract law, the parties to a contract may include any provisions to which the parties mutually agree. *See* 4 Samuel

Williston, Williston on Contracts § 2 (1993). Courts will not enforce provisions, however, that are contrary to public policy. *See id.* at § 12:1.

In the present case, the Court finds that New Jersey recognizes a strong public policy in favor of guaranteeing that landlords mitigate damages in the event of tenant default. For example, in *Sommer v. Kridel*, 378 A.2d at 772, the New Jersey Supreme Court cited with disapproval the pre-existing rule that had permitted a landlord to allow the premises to remain vacant while simultaneously pursuing a claim for back rent against the defaulting tenant. *Id.* In fact, the court determined that, in future actions, "the landlord shall be required to carry the burden of proving that he used reasonable diligence in attempting to re-let the premises." *Id.*

Similarly, in *Fanarjian v. Moskowitz*, 568 A.2d at 98, the court stated that "[t]he policy of this state has long been to require mitigation in all cases involving claims for damages, whether contract or tort." *Id.* (citations omitted). The court stated further that New Jersey recognizes important policy interests in ensuring that injured parties do not "sit idly by and exacerbate damages," thereby creating "economic and physical waste." *Id.* at 98–99.

Consequently, the Court finds that, under New Jersey law, the parties to a commercial lease are governed by general contract principles, including the rule that provisions contrary to public policy are unenforceable. Applying the law of New Jersey to the case at hand, the Court finds that Lease Section 14.04(b) is unenforceable to the extent it could be construed to relieve Drutman Realty of its obligation to mitigate damages. Accordingly, Drutman Realty had an absolute duty to mitigate damages upon default by Meridian under the Lease.[10]

## C. The Present Case

■ The Court now turns to whether Drutman Realty fulfilled its obligation to mit-

---

**10.** The parties also dispute whether the Guaranty separately obligates Drutman Realty to mitigate damages. Specifically, Jindo argues that the Guaranty, when considered separately from the Lease, does not eliminate Drutman Realty's duty to mitigate damages. Drutman Realty disagrees and argues that the Guaranty merely confers upon the parties the same rights and obligations as those enumerated in the Lease. As the Court has found that the Lease does not relieve Drutman Realty of its duty to mitigate damages, however, Drutman Realty's argument is moot.

igate damages after Meridian defaulted on the Lease in 1992. Jindo argues that it is entitled to summary judgment on its First through Third Counterclaims on the grounds that Drutman Realty sought an unreasonably high rental rate from potential replacement tenants. The Court disagrees and finds that a genuine issue of material fact remains.

In *Sommer v. Kridel*, 378 A.2d at 773–74, the New Jersey Supreme Court set forth the evidence that a factfinder should consider in determining whether a landlord has fulfilled its obligation to mitigate damages. Specifically, the court stated that the factfinder should consider, among other factors, "whether the landlord, either personally or through an agency, offered or showed the apartment to any prospective tenants, or advertised it in local newspapers." *Id.* The court stated further that, where the defaulting tenant presents evidence that he proffered suitable tenants who were rejected, "there is no standard formula for measuring whether the landlord has utilized satisfactory efforts in attempting to mitigate damages." *Id.* at 774. In short, "each case must be judged upon its own facts." *Id.*

In the present case, the Court cannot determine as a matter of law that Drutman Realty was unreasonable in seeking a higher rental rate from prospective tenants after Meridian's default. Although Jindo has presented some evidence suggesting that Drutman Realty's desire to receive approximately twenty dollars per square foot was unrealistic, there is other evidence indicating that Drutman Realty did not act unreasonably in negotiating a new lease with prospective tenants.

First, there is insufficient evidence in the record to make a determination as to the fair market rental value of the retail premises at the time of Meridian's default. For example, although Evans, Drutman Realty's real estate broker, stated that Drutman Realty was "a bit ambitious," he indicated further that its desired price was not outside "the gray area." *See* Evans Dep. at 29. Additionally, Drutman Realty was ultimately able to find a tenant willing to pay an average of $15.50 over the next four years, with the rental rate rising thereafter. Whether this price was above the fair market value is unclear based upon the limited record before the Court.

Second, the record is unclear with respect to the precise reasons for Drutman Realty's failure to reach an agreement with other prospective tenants at an earlier date. The Court is unable to ascertain whether the execution of a new lease with Leewards occurred after a reasonable amount of time or was unnecessarily prolonged. In sum, the reasonableness of Drutman Realty's actions after Meridian's default on the Lease is a question of fact that requires determination at trial. Accordingly, Drutman Realty's motion for summary judgment and Jindo's motion for summary judgment dismissing the complaint and on its First through Third Counterclaims are denied.

## III. Breach of Lease and Conversion

Jindo also moves for an order granting it summary judgment on its counterclaims for breach of contract (Fourth Counterclaim) and conversion (Fifth Counterclaim). Specifically, Jindo argues that Drutman Realty's refusal to allow Meridian to reclaim its renovations to the retail premises constitutes a breach of Lease Section 4.03 and a conversion under New Jersey law. Jindo's position is based on the premise that the renovations are trade fixtures rather than leasehold improvements. Drutman Realty opposes Jindo's motion, arguing that the renovations are leasehold improvements that are now part of the retail premises. Drutman Realty maintains further that, even if the renovations are trade fixtures, Jindo is not entitled to them as it failed to seek the return of the renovations within the time period provided by Lease Section 4.03. For the reasons that follow, Jindo's motion for summary judgment on the Fourth and Fifth Counterclaims is denied.

### A. Trade Fixtures

In order to ascertain whether Jindo relinquished ownership of the renovations, the Court must first determine whether the renovations are trade fixtures or leasehold improvements. In general, items affixed to the realty by a tenant become part of the realty and are no longer owned by the ten-

ant. *Handler v. Horns*, 2 N.J. 18, 65 A.2d 523, 526 (1949). One major exception to this general rule is that fixtures attached to the landlord's premises by a tenant "for the purpose of carrying on a trade or business for profit" continue to be owned by the tenant. *Id.* The New Jersey Supreme Court has stressed that it is "sound public policy to allow the tenant the greatest latitude to remove fixtures to encourage trade and industry." *Id.* Moreover, the court must place "special emphasis" upon the parties' intent whenever there is a dispute between the landlord and tenant with respect to the ownership of the trade fixtures. *Id.*

■ In the present case, the Court finds the renovations to be trade fixtures under New Jersey law. F.S. Paramus installed items such as removable track, lighting, video monitoring equipment, signs, storage units and display structures for the sole purpose of carrying on its fur sales business. Drutman Realty has failed to present any evidence tending to prove that the parties intended the renovations, valued at over $4 million, to become part of the retail premises. Moreover, it is simply contrary to reason to infer that Meridian intended to relinquish its ownership of the renovations upon termination of the Lease.

**B. Lease Section 4.03**

■ Having determined that the renovations are trade fixtures, the Court must next decide whether Meridian forfeited its ownership rights pursuant to Article 4 of the Lease. Lease Section 4.03 provides:

It is understood and agreed that if Lessee abandons the premises or moves out upon the expiration of this lease or after default in payment of rent or in violation of any provisions of this lease, it is dispossessed and a final order is entered, and after any of the said events, fails to remove any of its trade fixtures or property from the demised premises at the end of thirty (30) days therefrom, at the option of the Lessor, the fixtures and the property shall be deemed abandoned by Lessee and shall become the property of the Lessor.

Lease, annexed to the Drutman Aff. as Exh. "4," at 8. Thus, under Lease Section 4.03,

Meridian was obligated to remove its trade fixtures within thirty days after the occurrence of the first of the following events: (1) abandonment of the premises by Meridian; (2) moving out upon expiration of the Lease; or (3) entering of a final order after a default by Meridian.

Applying Lease Section 4.03 to the facts at hand, the Court finds that there is a genuine issue of material fact as to whether Meridian provided notice to Drutman Realty of its intention to remove the renovations within the thirty day period provided by the Lease. Specifically, the Court finds that it cannot be determined as a matter of law whether Meridian "abandoned" the premises or "moved out upon expiration of the Lease" more than thirty days prior to declaring its intention to remove the renovations.

■ Under New Jersey law, an abandonment of premises occurs when there is both an "act" and an "intent" to abandon. *Schnitzer v. Lanzara*, 115 N.J.L. 332, 180 A. 234, 236 (1935). "To constitute an abandonment of the premises means an absolute relinquishment of the premises by the tenant." *Id.* Moreover, premises are considered abandoned when they are "deprived of contents of substantial value." *Liqui–Box Corp. v. Estate of Elkman*, 238 N.J.Super. 588, 570 A.2d 472, 477 (N.J.Super.Ct.App.Div.1990). The "mere presence of several minimal items left behind" is insufficient to avoid a finding that the premises are vacated. *Id.*

With respect to the first prong of Lease Section 4.03, the Court finds that it is unclear whether Meridian abandoned the premises. According to Drutman Realty, Meridian abandoned the premises either in February 1992 when it closed The Fur Vault or in October 1992 when it ceased making rent payments. In opposition, Meridian argues that it never "abandoned" the premises within the meaning of Lease Section 4.03 and New Jersey law because it did not *intend* to abandon either the premises or the renovations remaining inside.

On the one hand, Meridian kept the key to the retail premises in order to gain access to its remaining property. Moreover, as Meridian did not remove its renovations, it left behind more than minimal items when it closed The Fur Vault. Further, Meridian

actively sought a third party willing to assume Meridian's obligations under the Lease. In fact, Meridian retained several real estate brokers to negotiate with prospective subtenants, including one who eventually found Leewards, the tenant that ultimately signed a new lease for the retail premises.

On the other hand, it is undisputed that Meridian closed The Fur Vault in February 1992 and removed its entire stock of furs. Additionally, the record is clear that Meridian ceased to meet its payment obligations as required by the Lease in October 1992. These factors could lead a reasonable jury to conclude that Meridian notified Drutman Realty of its intention to remove the renovations more than thirty days after Meridian had abandoned the retail premises.

With respect to the second prong of Lease Section 4.03, the Court similarly finds that there is a genuine issue of material fact as to whether Meridian "moved out" upon termination of the Lease. Although Meridian maintained valuable property at the retail premises, the closing of The Fur Vault could lead a factfinder to conclude that Meridian had moved out within the meaning of Lease Section 4.03. Further, a factfinder could determine that the termination of the Lease on November 27, 1992 amounted to an "expiration" of the Lease necessary to begin the running of the thirty day time period pursuant to Lease Section 4.03. Accordingly, Jindo's motion for summary judgment on its Fourth and Fifth Counterclaims is denied.

### CONCLUSION

For the reasons set forth above, Drutman Realty's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it summary judgment is denied. Jindo's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it summary judgment is also denied. The parties are directed to appear at a pre-trial conference on November 23, 1994 in order to set a date for the submission of a joint pre-trial order.

SO ORDERED.